# IN THE SUPREME COURT OF IOWA

No. 14–0277

Filed May 5, 2017

**STATE OF IOWA,**

Appellee,

vs.

**VERNON LEE HUSER,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Glenn E. Pille, Judge.

Defendant seeks further review of his conviction for murder in the first degree. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Alfredo Parrish and Andrew Dunn of Parrish, Kruidenier, Dunn, Boles, Gribble, Gentry, Brown & Bergmann, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, John P. Sarcone, County Attorney, Steve Foritano and Michael Salvner, Assistant County Attorneys, for appellee.

**APPEL, Justice.**

In this case, we consider an appeal by Vernon Huser arising from his conviction of first-degree murder in connection with the death of Lance Morningstar. In a separate proceeding, the State convicted Louis Woolheater of the Morningstar murder. The State prosecuted Huser on the theory that Huser aided and abetted Woolheater in the murder and was motivated to do so because Morningstar had an affair with Huser's wife.

At his first trial, Huser was convicted of first-degree murder. The court of appeals reversed his first conviction on the ground the district court improperly allowed the admission of prejudicial hearsay evidence. The State retried Huser, and he was again convicted. Huser appeals his second conviction.

Huser claims that his second conviction must be reversed because (1) the State failed to produce sufficient evidence to convict Huser of aiding and abetting the murder of Morningstar; (2) the district court erred in refusing to grant a mistrial, strike a witness's entire testimony, or give a requested curative instruction as a result of the improper admission of "backdoor" hearsay evidence; (3) the district court erred in refusing to admit evidence tending to show that Woolheater had personal motives for the murder; (4) the district court erred in refusing to grant a mistrial because of prosecutorial misconduct; and (5) cumulatively the above errors are sufficiently harmful to require reversal of Huser's conviction.

A divided court of appeals rejected Huser's claim. We granted further review. For the reasons stated below, we reverse Huser's conviction and remand the case for a new trial.

## I. Factual and Procedural Background.

**A. Conviction of Woolheater.** The partially decomposed body of Morningstar was discovered in February 2005 in a forested area in Altoona near Woolheater's home. Police immediately began investigating Woolheater and subsequently charged him with first-degree murder. Woolheater was convicted after a jury trial. The conviction was upheld by the court of appeals. *State v. Woolheater*, No. 10–0478, 2011 WL 6079094, at *6 (Iowa Ct. App. Dec. 7, 2011).

**B. First Huser Trial and Appeal.**

1. *Overview of evidence at the first trial.* In May 2009, the State charged Huser with murder in the first degree, alleging that he aided and abetted Woolheater in the killing of Morningstar. Huser pled not guilty. The case first came to trial in October 2010. *See State v. Huser* (*Huser I*), No. 10–2067, 2011 WL 6079120, at *2 (Iowa Ct. App. Dec. 7, 2011).

At the first trial, the evidence, as summarized by the court of appeals, showed that Vernon and Deb Huser met in the early 1990s. *Id.* at *1. The couple purchased a modest garbage disposal route and substantially grew the business into what became known as Ankeny Sanitation. *Id.* They ultimately married, but their relationship grew tumultuous in the summer of 2003. *Id.* The following fall, Huser grew suspicious that Deb was having an affair and hired a private detective who observed Morningstar—a mutual friend of the Husers'—and Deb together. *Id.* Huser confronted Deb, and she admitted the affair. *Id.* The affair continued until April 2004, and the Husers' divorce was finalized in May 2004. *Id.*

After the divorce, Huser remained very angry about the relationship between Deb and Morningstar and made statements threatening to "put the red dot" on Morningstar's head and that he could

hire someone to kill Morningstar and nobody would find the body. *Id.* Huser was introduced to Woolheater in the spring of 2004 by a friend, Lawrence Webb. *Id.*

Morningstar was last seen on September 30, 2004, leaving a bar at about 10:30 p.m. *Id.* at *2. On that date, Woolheater was spending time with a girlfriend, Michelle Zwank. *Id.* Woolheater instructed Zwank to drop him off at a baseball field outside Morningstar's house and return when called. *Id.* When Zwank returned to pick up Woolheater, he told her to drive to Morningstar's house. *Id.* At Morningstar's house, they loaded a body wrapped in a tarp into Zwank's truck and returned to Woolheater's residence. *Id.*

At trial, the State offered evidence of statements made by Woolheater to Webb, Patti Mitrisin, and Marie Connett. *Id.* at *6. Woolheater's friend, Webb, testified about statements made by Woolheater after Morningstar's body was discovered. *Id.* Webb testified that Woolheater told him (1) the body "wasn't supposed to be there. It was supposed to be in a pit in Oklahoma," (2) the murder weapon was "a .22," and (3) only Woolheater, Webb, and Huser knew about the body. *Id.* In addition, Webb testified that Woolheater told him that he had been following Morningstar, "was going to rough him up," and had already done so by breaking his ribs. *Id.* at *7. When Webb asked Woolheater why he would do that Woolheater replied, "Vern wanted something done about it." *Id.*

Mitrisin testified that in September 2004, she and Woolheater drove to Woolheater's Quonset hut where a person was waiting for Woolheater. *Id.* Woolheater exited the truck to talk to the person. *Id.* When he returned to the truck, Woolheater identified the individual as Huser. *Id.* When Mitrisin asked what they were talking about,

Woolheater replied, "[T]here was a guy messing around with Vern's wife or ex-wife . . . and he wanted this guy roughed up." *Id.*

Finally, Connett testified that she had a telephone conversation with Woolheater. *Id.* According to Connett, Woolheater told her that "there was someone he knew, one of his friend's wives was cheating on him, and that [his friend] wanted to kill him." *Id.* Connett further stated that Woolheater said he was going to kill the other man. *Id.* When she asked why, Connett reported Woolheater said, "Because we stick together." *Id.*

On this record, the jury convicted Huser of murder in the first degree by aiding and abetting another. Huser was sentenced to life in prison.

2. *First appeal.* Huser appealed. Huser argued, among other things, that the testimonies of Webb, Mitrisin, and Connett about what Woolheater told them were hearsay and should not have been admitted at trial. *Id.* at *6. The State argued that the challenged testimony was offered for a nonhearsay purpose. *Id.* at *11. We transferred the case to the court of appeals.

The court of appeals reversed. *Id.* at *13. The court of appeals noted that hearsay may be admitted to show the impact it had on a third party, but it could not be admitted to show or explain the conduct of the party making the statement. *Id.* at *11. The court of appeals noted that none of the hearsay statements were offered to show the impact of the statements on Webb, Mitrisin, or Connett. *Id.* Although defense counsel failed to properly object to the testimony of Webb and Connett, the court of appeals concluded that the failure to object amounted to a breach of a material duty. *Id.* at *12.

Having found the admission of hearsay from Webb, Mitrisin, and Connett impermissible, the court of appeals turned to the question of prejudice. *Id.* Because the hearsay from Mitrisin was subject to a timely objection, the court of appeals held prejudice was presumed, and the State must affirmatively establish that Huser's substantial rights were not injured by the jury's consideration of the hearsay statements. *Id.*; *State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004). With respect to the statements offered by Webb and Connett, the court of appeals recognized the burden rested on the defendant to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Huser*, 2011 WL 6079120, at *12 (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984)).

The court of appeals determined that Huser's conviction must be reversed because of the prejudice to Huser from the introduction of the hearsay statements. *Id.* at *13. The court of appeals recognized the State had presented strong evidence of Huser's motive to have Morningstar killed. *Id.* And, the State had presented compelling evidence that Woolheater killed Morningstar. *Id.* Yet, the court of appeals reasoned the three hearsay statements provided a critical link between Huser's motive and Woolheater's action. *Id.* According to the court of appeals, Woolheater's statements to Webb, Mitrisin, and Connett were "the most direct proof of Huser's encouragement of Woolheater's murderous acts." *Id.* at *12.

Finally, the court of appeals noted that the evidence of aiding and abetting was "not overwhelming." *Id.* at *13. The court of appeals emphasized there were no witnesses at the scene of the murder and no clear money trail between Huser and Woolheater. *Id.* Without the

hearsay evidence, according to the court of appeals, the link between Huser's motive and Woolheater's actions was incomplete. *Id.* According to the court of appeals, if counsel had "successfully objected to the inadmissible hearsay, [the court was] not fully confident that enough evidence remained on the record for a reasonable jury to convict Huser of aiding and abetting the murder." *Id.* Finding a reasonable probability that a different result would have occurred but for the admission of the hearsay testimony, the court of appeals reversed and remanded the case for a new trial. *Id.*

### C. Second Huser Trial and Appeal.

1. *Summary of evidence at the second trial.* The State elected to retry Huser on the first-degree murder charge based upon its aiding and abetting theory. The evidence offered at the second trial overlapped with the first trial but was not identical.

The evidence at the second trial showed that Deb and Morningstar commenced an affair sometime in the summer or fall of 2003. Huser had suspicions about the relationship early on. Deb moved out of the residence in January 2004. Huser's suspicions were confirmed when his son Nick—who, along with a business partner, had recently purchased Ankeny Sanitation from Huser and Deb—provided him with emails retrieved from Ankeny Sanitation. Huser further confirmed the affair by hiring a private investigator who provided photographs of Deb and Morningstar together at a Des Moines hotel.

As part of the sale of Ankeny Sanitation to Nick and his business partner, Deb and Huser were to remain employed at the business for a year. As a result, although they lived apart for most of 2004, they had contact with one another through the business until Deb left Ankeny Sanitation sometime in the summer of 2004.

In the spring of 2004, Huser and Deb tried marital counseling to save the marriage. At one point, Deb moved back into the marital residence in an attempt to reconcile. The marriage could not be saved, however, and their divorce became final on May 14, 2004.

The State introduced evidence that Huser was particularly impacted by the affair because Morningstar had been a friend of the Husers. According to Deb, Huser placed bets with Morningstar for several years. Morningstar also attended tractor pulls with Huser and Deb. The State offered evidence that Huser became suspicious when Deb and Morningstar came back late from an evening of drinking at a tractor pull. Kevin Frey, a friend of Huser's, testified that Huser was particularly upset with Morningstar because Huser and Morningstar had been friends. Another witness, Creighton Penney, testified Huser told him that Morningstar laughed at him when Huser called Morningstar to discuss the matter and that Huser reported Morningstar telling him that "if Deb would stop calling him, he would stop fucking her." According to Penney, Morningstar's cavalier demeanor made Huser mad.

Prior to Morningstar's disappearance on September 30, 2004, the State offered evidence that Huser made threatening statements about Morningstar. Specifically, the State introduced evidence that, prior to Morningstar's disappearance, Huser told Deb, "I'm going to kill the son of a bitch. He will turn up missing one day and no one will ever find his body." Huser stated many times within the earshot of Stephanie Duncan, an Ankeny Sanitation employee, that "he was going to kill that one-eyed motherfucker" and that "he was going to hide the body and that no one would ever find him." Huser told Penney—who rented warehouse property from Huser—that he wanted to kill Morningstar. Huser showed Penney a schedule of tractor pull events that he would attend and said if

anything would happen to Morningstar it would be when Huser was out of town. He also stated that he was going to "kick [Morningstar's] butt." Shortly after talking to Penney about Morningstar, Penney overheard Huser on a phone call with a third party declaring, "Let's go ahead and let's get it done."

Further, Huser told Deb's best friend, Jacque Wittick, that he wanted Morningstar to die or be taken out. Huser said he was going to have "Lance [Morningstar] taken out and then Debbie," and that he was "going to put the red dot on [Morningstar's] forehead and then put it on Debbie." Huser told Frey that "he wouldn't mind if [Morningstar] was gone" and that he "wanted him dead." Finally, Huser told a friend, Robert Bunce, that he wanted to "shake up" Morningstar.

The State offered evidence that in late summer or early fall of 2003, Huser and Bunce looked for Morningstar to confront him and drove by a bar that Morningstar frequented. Huser and Bunce continued on their way when they did not see his car. On March 17, 2004, Huser sat in a car in a parking lot across from a bar where Deb and Wittick were drinking. When Wittick came outside to talk to Huser, Huser asked whether Morningstar was inside. Wittick told Huser to stop stalking Deb. The State further introduced evidence Huser told Penney that on another occasion in the early morning hours sometime in June or July of 2004, Huser, accompanied by his son and his son's business partner, had been looking for Morningstar "to teach him a lesson."

The State also introduced evidence of Huser's statements or conduct after the disappearance of Morningstar on September 30, 2004, that tended to implicate Huser in the murder. Specifically, a person who attended a December 2004 holiday party in Ankeny testified Huser, when asked about Morningstar, told him that "Morningstar would be found

when the snow melts." Huser later told a friend that he was "in big trouble" after the discovery of Morningstar's body in February 2005. One witness testified Huser was mad at him for talking to the police after Morningstar's body was discovered.

The State's theory of the case was that Woolheater committed the actual murder of Morningstar. In the summer of 2004, Webb introduced Huser to Woolheater as someone who did gutter work. Woolheater, apparently, was something of a talker. Woolheater told (1) girlfriend Karon Humphreys that he was a Navy SEAL and had "a high kill rate;" (2) girlfriend Jackie Putz that he was "like a bounty hunter" and would "go out and find people and bring them back;" (3) Webb that that he was "like a mercenary" and would "go take care of people or whatever" and discussed things like bullet velocity and projectile drop; and (4) girlfriend Mitrisin that "he may have to leave for days or weeks" and that he was "a peacekeeper," which meant that "he would have to take people out."

The State offered compelling evidence that Woolheater killed Morningstar. Morningstar's body was found near Woolheater's home. Woolheater's girlfriend, Zwank, testified that (1) she drove Woolheater to a ball field near Morningstar's home on the evening of September 30, (2) Woolheater exited the vehicle with a bag that looked like a pool cue bag, (3) she later helped Woolheater load what seemed to be a body into the trunk of her car, (4) she helped Woolheater drive Morningstar's truck to a parking lot of a tavern, (5) she helped Woolheater load a lawnmower from the Morningstar residence onto Woolheater's truck, and (6) Woolheater ultimately asked her to store the lawnmower. Shortly after Morningstar's body was discovered, Woolheater told a friend "the body was not supposed to be there . . . it was supposed to be in Oklahoma in a pit." Another girlfriend of Woolheater's found

Morningstar's wallet in a bathroom cabinet of Woolheater's residence after Morningstar's disappearance.

The State further offered evidence that Woolheater owned a .22 caliber rifle with a scope that provided the shooter with a red-dot sight and a bag for transporting the rifle. Five .22 caliber bullets were recovered from Morningstar's body, and although ballistics experts could not make a definitive determination because of the deterioration of the slugs, the markings on the bullets were consistent with Woolheater's rifle.

Finally, the State offered evidence designed to link Woolheater and Huser. The State offered evidence that Huser hired Woolheater to do gutter work on property owned by Huser. Phone records showed a number of phone calls between Huser or Ankeny Sanitation and Woolheater during the summer and fall of 2004, but no phone calls in October or November. Huser and Woolheater were seen talking in the parking lot of property owned by Huser. Five days before the disappearance of Morningstar, Huser allowed Woolheater to use his cell phone to call Woolheater's girlfriend to pick Woolheater up at a bar where Woolheater had become intoxicated.

The State offered evidence that Huser made a phone call on behalf of Woolheater to a member of the Bloomfield Fair Board, supporting Woolheater's desire to race sprint cars. Before making the call, Huser asked if Woolheater, who claimed to be a Navy SEAL, was "for real." A State's witness testified that the witness believed Huser was questioning the degree of experience and knowledge Woolheater claimed to have about guns.

The State offered evidence linking Huser and Woolheater after Morningstar's disappearance. A friend of Woolheater who arrived at

Woolheater's residence shortly after the discovery of Morningstar's body testified that Woolheater told him that the only persons who knew about the situation were the friend, Woolheater, and Huser. Later in November, Woolheater, Huser, and a companion of Huser's were drinking together in a bar. Woolheater provided Huser's companion with wine. Later, Huser and the companion drove to Woolheater's house to pick up a couple of bottles for Huser's companion to take with her.

The State was unable to show a money trail from Huser to Woolheater. Deb testified, however, that Huser ordinarily had ten to fifteen thousand dollars in cash at his residence. Huser paid a private investigator in cash for his work in establishing that Deb and Morningstar had spent the night together at a Des Moines hotel. Further, the State offered evidence that Woolheater borrowed money from several girlfriends in the past and was behind on his rent for his home and the Quonset hut that he rented.

Finally, the State offered evidence obtained from a search of the Quonset hut rented by Woolheater that linked Huser and Woolheater. In executing the search, police found a business card from Ankeny Sanitation with the annotation "call me" written on the back. In the container in which the Ankeny Sanitation business card was found, police uncovered a printout of the county assessor's website showing Morningstar's residence. In addition, police recovered a yellow sticky note from Woolheater's home with the address of Deb's new residence, which she established in August 2004. Deb testified the handwriting on the yellow sticky note was Huser's. A forensic expert testified the handwriting was probably Huser's.

At trial, the defense sought to show that while Huser was originally angry at Morningstar, Huser got over it. Huser himself testified that he

might have made inappropriate remarks about Morningstar early on, but that he came to see Deb—who was married at the time of the affair while Morningstar was single—as primarily responsible for the affair. According to Huser, after the divorce was final, Deb was upset because she wanted to continue to work on the marriage but he "was done with it." The defense noted there was no evidence Huser harassed Deb's new boyfriend after the divorce or another unidentified paramour of Deb's.

Huser offered evidence that Morningstar was a bookie and owned racehorses. Morningstar's son, Lynn, testified his father stopped taking bets after the 2003 Super Bowl. According to Lynn, his father always had a pistol under the couch and a shotgun at the door of the residence. Lynn lived with his father when Morningstar disappeared. Lynn admitted he was taking methamphetamines during this time. Lynn was later arrested for conspiracy to manufacture meth. This evidence was designed to suggest Morningstar and his son lived the kind of lifestyles that could accumulate enemies, who might be responsible for Morningstar's death.

Huser also offered evidence related to Woolheater's problems with the law. Woolheater was a convicted sex offender who was required to register in Iowa. On March 16, 2004, Woolheater was arrested for noncompliance with sexual registration laws. On August 19, Woolheater was placed on probation because of the violations. Woolheater was arrested again on December 23, 2004, for violations of probation, including possession of firearms and failure to secure permission prior to changing a residence. Woolheater stipulated to the violations on February 7 and was ordered to serve ninety days of incarceration.

The defense asserted police had attempted to gather additional evidence for the case against Huser but were unsuccessful. The police

placed a GPS device on Huser's truck, but no evidence was developed. Penney was given a key fob to record conversations with Huser, but nothing of value resulted. Huser also attacked experts offered by the State as having inconclusive opinions. The ballistic results were inconclusive, handwriting experts could only "probably" identify writing samples, and the time of death had never been firmly established. The defense emphasized law enforcement was unable to find a money trail from Huser to Woolheater. Additionally, law enforcement was unable to find any reference to Woolheater on Huser's various computers, which police seized as part of their investigation.

2. *Motion to suppress Woolheater's out-of-court statements.* Prior to trial, Huser filed what he styled a "Motion to Suppress Woolheater's Out of Court Statements." In the motion, Huser sought to prevent the State from introducing evidence of Woolheater's statements to Webb, Mitrisin, and Connett that the court of appeals had ruled inadmissible in *Huser I*. The State resisted, asserting that while the court of appeals ruled the evidence could not be considered nonhearsay, the State could introduce the evidence as admissions against interest or as statements of a coconspirator in furtherance of the conspiracy—theories of admission that were not presented to the court of appeals. Huser countered that the State could not raise a different theory of admissibility at the second trial.

The district court agreed with Huser, ruling that under the doctrine of the "law of the case," the State could not assert a different ground or theory for the admissibility of this evidence. As a result, the district court ruled that "Connett and Mitrisin's testimony and parts of Webb's testimony about Woolheater's statements *before the murder* are inadmissible."

3. *Backdoor hearsay issue at trial.* The State did not offer testimony from Webb and Connett at the second trial. It did, however, call Mitrisin to the stand.

Prior to Mitrisin's testimony, the State and defense counsel met to discuss how the questioning of Mitrisin would be conducted. The informal conference was not recorded. There is no dispute, however, that Huser's counsel agreed Mitrisin could testify about Huser being the person she saw meet with Woolheater at the Quonset hut in August or September 2004, immediately prior to the murder.

During direct examination of Mitrisin, the State established that Huser was the person Woolheater met with at the Quonset hut. But the State did not leave it there. The State continued its questioning:

> Q: Okay. Could you hear what they were talking about? A: No, I could not.
>
> Q: Could you observe their demeanor? A: Just like two men talking.
>
> Q: Okay. I know it's been a long time, but do you remember when this interaction occurred? A: The best that I can remember would have to be the end of August or the first part of September.
>
> Q: And that would be in the year 2004? A: Right.
>
> Q: I do have just a couple of quick questions. Now, without telling me what Mr. Woolheater said, did he ever speak of Lance Morningstar? A: Yes.
>
> Q: Without telling me what Mr. Woolheater said, did he ever speak of Deb Huser? A: Yes.
>
> Q: And without telling me what Mr. Woolheater said, did he speak about Vern Huser? A: Yes.

The defense did not immediately object. After the close of Mitrisin's direct examination, Huser's lawyer asked to approach the bench and a discussion was held off the record. The trial resumed, and

Huser's lawyer briefly cross-examined Mitrisin. Mitrisin was then excused. Outside of the presence of the jury, and over the next couple of days, the parties argued about the propriety and admissibility of the last three questions posed to Mitrisin.

Huser's attorney strenuously objected to the State's additional questioning of Mitrisin and moved for a mistrial. Huser's attorney claimed,

> I thought we had this worked out. . . . [The State] said they had no intention of getting into the prohibited hearsay area that the Court of Appeals had said was unacceptable and also that this Court has ruled was unacceptable.
>
> We went over—we previewed the questions. We debated about it. The State then indicated that they would just ask if she would identify Mr. Huser, and that would be the end of it. Was that acceptable, as far as it would go? We said we agreed.
>
> . . . [T]hey assured us that that's as far as the questions would go.

Huser's attorney accused the prosecutor of deliberately attempting to elicit impermissible hearsay through the backdoor by asking Mitrisin if Woolheater had ever talked about Morningstar, Deb, and Huser immediately after identifying the September 2004 conversation between Huser and Woolheater. These questions, Huser's attorney stressed, would cause the jury to make an inference that the content of the discussion between Woolheater and Huser just prior to Morningstar's disappearance centered on what Huser wanted done to Morningstar.

Huser's counsel stated that no objection was made at the time the evidence came in because the testimony was already subject to a motion in limine and that "[the judge] told us we didn't have to make an objection." Further, Huser's counsel stated that he did not jump up and

yell mistrial because it would have highlighted the testimony for the jury. Instead, he waited until the close of Mitrisin's direct testimony.

Huser's counsel also attacked the State's claim that the evidence was not hearsay. In support of its position, the State's attorney provided the district court with *State v. Farrar*, No. 10–1039, 2011 WL 3480999 (Iowa Ct. App. Aug. 10, 2011). Huser argued the State misread the *Farrar* case, and it was not on point. Further, Huser argued, the fact the State had the *Farrar* case ready when Mitrisin's testimony came in showed bad faith on the part of the State. Huser asserted the State intended to ambush Huser all along.

The State defended on both substantive and procedural grounds. On procedural grounds, the State noted the defense did not make a contemporaneous objection when the testimony came in, but waited until Mitrisin's direct examination was complete to object. Thus, the State argued, Huser waived the objection. The State asserted Huser's counsel made a tactical decision to allow the tainted evidence into the record and then move for a mistrial rather than objecting in a timely fashion, which would have given the district court an opportunity to rule on the objection before the evidence came in.

On substance, the State argued Mitrisin's testimony was not hearsay. The State stressed the language of its questions, namely, whether Woolheater had *ever* talked about Morningstar, Deb, or Huser.

The State claimed that *Farrar* supported its position. In *Farrar*, the defendant was accused of domestic abuse, but the alleged victim did not respond to a subpoena and was not present in court. 2011 WL 3480999, at *1. The state attempted to offer evidence of what the alleged victim told an officer, yet avoid hearsay problems through a "without telling me what [the nontestifying witness] told you" strategy. *Id.* at *2. The

evidence came in without objection, giving rise on appeal to an ineffective-assistance-of-counsel claim. *Id.* The examination by the state in *Farrar* was as follows:

> Q: Without telling me what Ms. Clark told you, did Ms. Clark tell you what occurred in that apartment that night? A: Yes.
>
> Q: Without telling me what she told you, did she tell you how she received these injuries? A: Yes.
>
> Q: After the accounts of what occurred or the injuries, were the injuries to her face and eyes consistent with being struck in the face? A. Yes.
>
> Q: Obviously, there was injury to both eyes. Was it being consistent with being struck more than once? A: Yes.
>
> Q: Without telling me what Ms. Clark told you, after speaking with her, were you investigating a crime? A: Yes.
>
> . . . .
>
> Q: Did you have a possible, primary aggressor or suspect? A: Yes.
>
> Q: Who was that? A: Mr. Farrar.

*Id.*

On appeal, Farrar contended that this "without telling me what [the nontestifying witness] told you" strategy violated his right to confront witnesses under the Confrontation Clause of the Sixth Amendment. *Id.* As a result, his counsel was ineffective for failing to object to this line of questioning. *Id.* The state countered that the carefully worded questions did not elicit hearsay answers. *Id.*

The majority of the court of appeals held that the question of whether Farrar's attorney should have objected on Confrontation Clause or hearsay grounds should be preserved for postconviction-relief proceedings to allow trial counsel an opportunity to address the issue. *Id.* at *3. In support of its conclusion, the majority cited a federal

appellate case. *Id.* (citing *United States v. Check*, 582 F.2d 668, 679 (2d Cir. 1978) (concluding the state had "audaciously" introduced out-of-court statements by supposedly restricting an undercover agent's testimony to his half of the conversation)). As a result, the majority affirmed Farrar's conviction. *Id.* at *3.

Judge Vogel concurred in the result, but would have decided the Confrontation Clause and hearsay issues in favor of the state on direct appeal. *Id.* at *3 (Vogel, P.J., concurring specially). According to Judge Vogel, the officer's testimony in *Check* conveyed "the precise substance" and "indeed the minutiae" of out-of-court statements made by an informant. *Id.* (quoting *Check*, 582 F.2d at 675, 683). In Farrar's case, Judge Vogel asserted that at no point did the testimony convey "the precise substance" of the absent witness's statements. *Id.*

The district court ruled against Huser on the mistrial motion related to the backdoor hearsay testimony of Mitrisin. The district court was unpersuaded by the State's argument the testimony was not hearsay, noting "the prosecutor was acting as a transparent conduit for the introduction of inadmissible hearsay." The district court, however, declined to grant a mistrial because there was other admissible evidence before the jury of the connection between Woolheater, Huser, and Deb. Therefore, the district court reasoned, any harm from the Mitrisin hearsay was minimal and did not justify a mistrial.

Huser's attorney then asked the court to strike the questions, admonish the jury to disregard the testimony, and prohibit the State from referring to the statements for the rest of the trial. The prosecutor replied he had no objection to striking the questions or admonishing the jury, but he was not sure how an admonishment could be crafted without alerting or reminding the jurors about the testimony. Huser's

attorney agreed to work with the State in crafting a suitable admonishment. The district court agreed to let the attorneys work on an admonishment. Ultimately, however, the parties could not agree to a curative instruction, and Huser moved to strike Mitrisin's trial testimony in its entirety because of the three hearsay questions and answers. Huser wanted the entire testimony stricken because the defense did not want to highlight the three questions.

The motion to strike Mitrisin's entire testimony was denied. The district court did agree, however, to order the State not to mention Mitrisin's answers to the additional questions in the State's closing argument.

Later, in discussing jury instructions, Huser's attorney argued he was in a "Catch-22" situation because the jury could not be instructed to disregard the Mitrisin backdoor hearsay without reminding the jury of the hearsay. Huser proposed, therefore, that since the motion for a mistrial and the motion to strike Mitrisin's entire testimony were not granted, the only acceptable admonishment would be an instruction stating,

> During the State's case when presenting the testimony of its witness Patti Mitrisin the State knowingly and intentionally asked improper questions regarding conversations she had with Mr. Woolheater. Whatever Mr. Woolheater said to Ms. Mitrisin cannot be considered by you when deciding this case.

Additionally, Huser proposed two alternative instructions: "The information from the questions would be unfavorable to the State and favorable to Vern Huser" or "The State acted in bad faith by asking the questions, and you may draw any inference favorable to Mr. Huser." The State resisted the instructions.

The district court rejected Huser's proposed instructions on Mitrisin's testimony. As previously ordered by the court, however, the prosecutor did not mention the Mitrisin backdoor hearsay in its closing argument.

4. *Limitation on Zwank testimony.* Zwank testified at Huser's second trial. According to an offer of proof made at trial, Zwank was prepared to testify that Woolheater told her a couple of days prior to the murder than Morningstar had something against Woolheater that could send Woolheater, who was on probation at the time, back to jail. Woolheater also told her that two people, Ricky and Mark, would help him deal with Morningstar. Further, after Zwank drove Woolheater to a ball field on the night of the murder, Woolheater, looking at his phone, declared, "They're here," before leaving the vehicle carrying a soft-sided bag. Later, when Zwank returned to pick up Woolheater, he told her he had to take care of Morningstar because Morningstar had something on him concerning his past. Finally, Woolheater told Zwank that "Ricky made one hell of a shot." Huser argued Zwank's hearsay testimony was admissible as a statement made by a coconspirator in furtherance of the conspiracy or as an admission against interest.

The State resisted. The State asserted that with regard to the statement against interest theory, if the Zwank testimony came in, the testimony of Webb, Mitrisin, and Connett should also be admissible. The State argued that because the court of appeals ruled the testimony of Webb, Mitrisin, and Connett was inadmissible, the Zwank statement should be inadmissible. If the court allowed the Zwank testimony, the State indicated it would ask the court to reconsider its ruling, an apparent reference to the court's determination in the motion in limine that the hearsay evidence of Webb, Mitrisin, and Connett was

inadmissible. Huser responded, in part, by urging the court to find Zwank was a coconspirator, and under a theory of admissibility of statements in furtherance of a conspiracy, her statements could come into the record while the statements of Webb, Mitrisin, and Connett would not because they were not coconspirators.

The district court, however, continued to explore whether the admission of Zwank's testimony opened the door to the testimonies of Webb, Mitrisin, and Connett. The district court noted that it had already found a conspiracy between Huser and Woolheater and that, as a result, if Woolheater's statements to Zwank came in under a coconspirator theory, the statements of Webb, Mitrisin, and Connett were also admissible. In any event, the district court expressed doubt that Zwank was a coconspirator.

In response, Huser's counsel returned to the admission against interest theory. The district court responded, "[Y]ou can't use it as a shield and a sword at the same time." The district court then stated,

> So my ruling is, I'm going to rule that she's not a coconspirator in this particular case. And, if you want to go into these other statements, then I think that does open the door and I reexamine the whole issue about either co-conspirator's statements: hers, Woolheater's, notwithstanding the Court of Appeals decision.[1]

---

[1]In *Huser I*, the court of appeals ruled only that the statements made by Woolheater to Webb, Mitrisin, and Connett were not nonhearsay and therefore were inadmissible. 2011 WL 6079120, at *10–12. The State did not argue in the *Huser I* appeal that the statements could be admitted under exceptions to the hearsay rule such as admissions against interest or statements of a coconspirator in furtherance of the conspiracy. The court of appeals emphasized that the sole issue before it was whether the statements to Webb, Mitrisin, and Connett were nonhearsay. *Id.* at 10. The court of appeals thus did not rule on the question of whether the statements could be admitted under any exception to the hearsay rule.

At this point, the defense made its offer of proof. By agreement of the parties, Zwank's examination was continued, with the court noting "maybe we will discuss this some more." But according to the district court, its "gut reaction" was Huser was entitled to introduce the evidence "but it opens the door."

5. *Claims of prosecutorial misconduct.* During the second trial, Huser claimed the State engaged in prosecutorial misconduct by improperly destroying data from a polygraph examination of Lynn Morningstar. In addition, Huser claimed that during voir dire, police revealed for the first time a police dash cam video showing Huser, Morningstar's son, and others after Morningstar went missing. The district court, however, concluded there was no intentional destruction of evidence and there was no showing the underlying data contained exculpatory evidence.

Huser also argued in favor of a mistrial based upon four references at trial to the prior trial. First, when the State's witness Deb Huser was testifying and reference was made to her prior deposition testimony, the prosecutor interrupted asking, "I'm sorry, are you talking about the deposition or the trial transcript?" Second, in examining witness Bunce, the State made several references to Bunce's "prior sworn testimony" instead of "prior sworn statements" as agreed by the parties. Third, when the State's witness Frey was asked whether he knew Woolheater, the witness volunteered that he attended Woolheater's trial or "gave a deposition at his trial." Finally, during Huser's own testimony, on cross-examination the State repeatedly referred to Huser's "testimony today." The district court declined to order a mistrial for any of these events, and the defense declined to seek an instruction, reasoning that it would do more harm than good.

6. *Verdict and posttrial motions.* The jury returned a guilty verdict. Huser filed various posttrial motions, which were rejected by the district court. The court sentenced Huser to life in prison.

7. *Second appeal.* Huser appealed, and we again transferred the case to the court of appeals. The court of appeals affirmed.

The court of appeals stated that appellate courts review a district court's mistrial ruling for abuse of discretion. The court also noted that a district court's decision on whether to admit or exclude hearsay evidence is reviewed for correction of errors at law. The court then reviewed the district court's decision not to grant a mistrial based on improperly admitted hearsay evidence for abuse of discretion. The court explained,

> While Huser requests we apply the test used to determine whether the district court's admission of hearsay caused prejudice, . . . the issue on appeal is not whether the testimony of Mitrisin is hearsay. . . .
>
> The issue on appeal is whether the court should have granted Huser's motion for a mistrial after the testimony was admitted.

The court of appeals held the district court did not abuse its discretion in declining to grant a mistrial because of the Mitrisin hearsay. The court explained the offending questions occurred during a fourteen-day trial involving at least forty-five witnesses. Other witnesses testified to seeing Huser and Woolheater together. Additionally, there was testimony about the post-it note containing Huser's ex-wife's address in Huser's handwriting found in Woolheater's home. The court of appeals held, therefore, Mitrisin's testimony was not prejudicial because the same evidence obtained from other sources was properly in the record.

The court of appeals also held that Zwank's exculpatory hearsay testimony was not inextricably intertwined with the murder because,

among other reasons, the statements did not implicate or involve Huser. The court agreed with the district court that Zwank was not a coconspirator with Woolheater in the murder. The court also found there was insufficient corroborating evidence to indicate the trustworthiness of Woolheater's statements to Zwank for the testimony to be admissible as a statement against interest. Additionally, the court found that if Zwank's hearsay testimony was admitted, it would have opened the door for Mitrisin's testimony because these statements were similarly focused on Woolheater's motivation to kill Morningstar. If the jury was permitted to hear evidence of Woolheater's independent motive, it should also be permitted to hear evidence of the State's theory of motive.

The court of appeals also held there was sufficient evidence to support the verdict, the district court properly declined to grant a mistrial based on prosecutorial misconduct, and Huser was not denied a fair and impartial trial through cumulative errors. The court of appeals, therefore, affirmed the district court.

A dissenting opinion argued that the district court should either have granted a mistrial or struck Mitrisin's testimony in its entirety and would have reversed on that ground. The dissent found that "the prosecutor posed a series of carefully crafted questions to Mitrisin, which established the truth of the matter asserted, that is, Woolheater had spoken about Lance Morningstar and Deb Huser, individuals whom Mitrisin otherwise did not know." While the dissent recognized the prosecutor asked whether Woolheater had "ever" spoken about these individuals, the questions followed "immediately on the heels of Mitrisin's description of Woolheater and Huser having a man-to-man discussion out of her earshot at Woolheater's Quonset hut."

The dissent noted caselaw critical of efforts to circumvent the hearsay rule through the artifice of supposedly restricting testimony. *See Check*, 582 F.2d at 679. The dissent concluded the prosecutor misread *Farrar* as supporting the State's position, noting that the majority in *Farrar* "plainly did not endorse the practice." Further, the dissent observed the prosecutor circumvented the district court's directive on hearsay evidence, noting the district court generously decided the State violated only "the spirit of the court's motion in limine ruling." In the dissent's view, the district court should have granted the mistrial or stricken the entirety of Mitrisin's testimony.

Additionally, the dissent stated there were sufficient corroborating circumstances to support the admissibility of Zwank's testimony as statements against interest and allowing the testimony should not have been viewed as opening the door to the Mitrisin hearsay. The dissent noted that in *State v. Paredes*, we emphasized a multifactor test designed to determine whether the out-of-court statement had "substantial plausibility." 775 N.W.2d 554, 568 (Iowa 2009). The dissent found that Woolheater's statements to Zwank met the *Paredes* test.

Huser applied for further review, and we granted the application.

## II. Substantial Evidence to Support Aiding and Abetting.

**A. Positions of the Parties.** Huser argues there was insufficient evidence to show that he aided and abetted Woolheater in the murder of Morningstar. There was no evidence, he maintains, to show that Woolheater had any knowledge that Huser was angry about his wife's affair with Morningstar or allegedly wanted revenge on Morningstar.

Huser also argues the court of appeals improperly relied on facts not in the record in affirming the district court. The court of appeals opinion, he asserts, declined to state the complete factual background in

the fact section of its opinion, stating the facts were "thoroughly laid out in the prior opinions [of the] court and need not be repeated here." Huser asserts the court of appeals did not explain how the evidence presented in his second trial differed from the evidence presented in his first trial even though the court stated it would.

The State argues there was substantial evidence to support the jury's finding Huser aided and abetted Woolheater in the murder of Morningstar. The State points to multiple pieces of evidence that could lead a reasonable jury to infer Huser hired Woolheater to murder Morningstar.

**B. Standard of Review.** We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). We consider the evidence in the record "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.* (quoting *State v. Keopasaeuth*, 645 N.W.2d 637, 640 (Iowa 2002)). We will, however, consider all evidence in the record, including evidence that does not support the verdict. *State v. Petithory*, 702 N.W.2d 854, 856–57 (Iowa 2005). Evidence raising only "suspicion, speculation, or conjecture is not substantial." *State v. Leckington*, 713 N.W.2d 218, 221 (Iowa 2006).

**C. Legal Requirements for Aiding and Abetting of First-Degree Murder.** In *State v. Ramirez*, we considered the parameters of aiding and abetting a crime. 616 N.W.2d 587 (Iowa 2000), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 25–26 (Iowa 2001). We stated,

> To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act by either actively participating or encouraging it prior to or at the time of its commission.

*Id.* at 591–92.

Similarly, in *State v. Neiderbach*, we stated that in order to support an aiding and abetting theory, the record must contain substantial evidence that the accused assented to or lent countenance and approval to the criminal act "either by active participation or by some manner encouraging it prior to or at the time of its commission." 837 N.W.2d 180, 211 (Iowa 2013) (quoting *State v. Spates*, 779 N.W.2d 770, 780 (Iowa 2010)). We observed, "Knowledge is essential; however, neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting." *Id.* (quoting *State v. Hearn*, 779 N.W.2d 577, 580 (Iowa 2011)).

Aiding and abetting may be proven by direct or circumstantial evidence. *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994). Direct and circumstantial evidence are equally probative. *State v. McGuire*, 572 N.W.2d 545, 547 (Iowa 1997). We have stated that a fact finder may infer a defendant's participation from all of the surrounding circumstances of the illegal activity, including evidence of presence, companionship, and conduct before and after the offense is committed. *State v. Rohm*, 609 N.W.2d 504, 510 (Iowa 2000); *State v. McClelland*, 162 N.W.2d 457, 463 (Iowa 1968).

The principles of aiding and abetting are illustrated in the case of *Jones v. United States*, 625 A.2d 281 (D.C. 1993). In that case, Jones was charged with aiding and abetting an assault with a dangerous weapon. *Id.* at 282. The evidence at the district court showed the victim saw Jones talking with the principal assailant on the street before the assault occurred. *Id.* at 283. Jones then walked past the victim, brushing within inches of her but not touching her. *Id.* Immediately afterward, the assailant stabbed the victim. *Id.* The assailant then

followed after Jones. *Id.* A witness saw the two men "join up" and saw that they were laughing and talking. *Id.* Jones and the assailant were in a sexual relationship and lived together. *Id.* at 284, 287.

The Illinois court stated there was no doubt the victim was stabbed and there was substantial evidence that Jones's romantic partner was her assailant. *Id.* at 288. There was substantial evidence that Jones was present at the scene of the crime. *Id.* at 288–89. There was not, however, substantial evidence that Jones conducted himself in a way designed to encourage or facilitate the crime or that Jones had the necessary mens rea for assisting or participating in the assault. *Id.* at 289. The evidence showed that Jones passed very close to the victim on the street, but this was not enough to allow for a reasonable inference that the victim was distracted by this or that Jones intended to distract her to facilitate the assault. *Id.* Additionally, the court held the testimony that Jones and the assailant were laughing and talking after the assault does not lead to any reasonable inference of guilty knowledge. *Id.* at 289 n.6.

In this case, Huser was charged with aiding and abetting Morningstar's murder. In murder cases based on aiding and abetting, the State must show that the accused either acted with the requisite intent or had knowledge that the party who committed the murder acted with the requisite intent. *State v. Tangie*, 616 N.W.2d 564, 573 (Iowa 2000).

There are not many authoritative Iowa cases involving aiding and abetting murders under circumstances similar to this case. An Illinois appellate court, however, considered whether an accused could be convicted of aiding and abetting a murder based on circumstantial evidence. *See People v. Mitchell*, 299 N.E.2d 472, 474 (Ill. App. Ct. 1973)

(involving a fight between the defendant and the victim, where later the defendant's brother shot the victim). According to the Illinois court,

> Mere expression of enmity toward the victim of a crime does not constitute aiding and abetting its commission. Where the assistance is rendered by words of encouragement and incitement, it must be proved that they were addressed to, or heard by, the actual criminal.

*Id.* at 478 (quoting 22 C.J.S. *Criminal Law* § 88(2), at 265).

**D. Discussion.** As can be seen above, there is no question that Huser frequently made statements to multiple people that he would like to see Morningstar killed. There was some dispute regarding the timing of the statements, with Huser arguing that any statements made about Morningstar were made earlier in 2004 and that he had gotten over his animosity well before the disappearance of Morningstar. Given the strength of the statements and the fact that Huser continued to make statements about Morningstar's demise after his disappearance, we think a reasonable jury could conclude that Huser's animosity toward Morningstar was not resolved at the time of Morningstar's death. Thus, there is substantial evidence to support a motive for Huser to aid and abet the murder of Morningstar.

There is strong evidence that Woolheater killed Morningstar. Huser tried to suggest at trial that perhaps Lynn Morningstar had something to do with his father's death, but Zwank's testimony leads powerfully in a different direction. It is true that as a former bookie with a meth-afflicted son living at his home, Morningstar may have had other potential enemies. A reasonable jury, however, could have credited Zwank's testimony, which was highly incriminating of Woolheater but also did not cast Zwank in a very favorable light.

That leads us to the key issue: Did the State offer sufficient evidence to show a relationship between Huser's animosity toward Morningstar and the actions of Woolheater sufficient to support the State's theory that Huser aided and abetted Woolheater in the murder?

There was no smoking gun showing that Huser aided and abetted Woolheater. There was no testimony in the record of the second trial explicitly showing that Woolheater knew about the animosity between Huser and Morningstar. There was no testimony about conversations between Huser and Woolheater concerning the need to teach Morningstar a lesson or anything similar. Although there was evidence that Woolheater seemed to be in need of money, there was no documented money trail between Huser and Woolheater. The State's investigative efforts using GPS devices and audio recorders turned up nothing.

Yet, the State presented the jury with important circumstantial evidence. A husband whose wife had an extramarital affair can be expected to be angry, but the threats made by Huser were vicious and out of the ordinary even under the difficult circumstances he faced. Ankeny is a small community, and Huser and Woolheater traveled in the same circles. There was evidence that Huser drank with Woolheater both before and after Morningstar's disappearance and, on one occasion, allowed him to use Huser's cell phone to arrange a ride home after Woolheater became intoxicated. A jury could infer that Woolheater was well aware of Huser's marital problems and his attitude toward Morningstar—as at least occasional drinking compatriots, they must have discussed them. Further, a jury could have credited testimony that Huser made inquiries about whether Woolheater was "for real" to determine his prowess with guns and his availability to provide services

to Huser. In addition, a jury could have credited Webb's testimony that Woolheater told him around the time Morningstar's body was discovered that the only persons who knew of the body were Webb, Woolheater, and Huser.

Further, Huser talked about putting a red dot on both Morningstar and Deb. Woolheater's rifle, which a reasonable jury could have concluded was the murder weapon, featured a scope with a red dot sight mechanism. The phone calls between Huser and Woolheater, which had been happening for several months, stopped after Morningstar's disappearance. Although there was no money trail, Huser often dealt with cash, and the jury may have concluded he had access to a stash at home sufficient to compensate Woolheater. Woolheater's possession of a yellow sticky note with Deb's address is curious, as is the fact that an Ankeny Sanitation business card with the phrase "call me" on the back was found in the same container as a printout of a county assessor's page for the Morningstar residence. Finally, a jury could well give weight to testimony that Huser made statements like "[n]o body, no crime" and "[t]hey'll find [Morningstar] when the snow melts."

On balance in this vigorously contested case, we conclude the evidence is sufficient to support the jury's verdict. Under our cases, we have held that direct and circumstantial evidence are equally probative. *McGuire*, 572 N.W.2d at 547. None of the facts presented above, standing alone, would be sufficient to support a verdict, but their cumulative effect provides a reasonable basis for the jury's guilty verdict. Because of the companionship between Woolheater and Huser; Huser's oft-expressed animosity toward Morningstar; Huser's threatening reference to a red-dot target that was consistent with the gun seized from Woolheater, which had a scope that generated a red dot for the shooter;

Huser's apparent knowledge of Morningstar's death prior to the discovery of the body; and Woolheater's statement to Webb at the time the body was discovered that only Webb, Woolheater, and Huser knew about the body, we conclude that there was sufficient evidence for the jury to reasonably conclude that Huser must have aided and abetted Woolheater in Morningstar's death.

**III. Challenges Related to Mitrisin Testimony.**

**A. Introduction.** In *Huser I*, Huser challenged the admission of Woolheater's hearsay declarations attributing his motive in killing Morningstar to Huser, offered through the testimonies of Webb, Mitrisin, and Connett. 2011 WL 6079120 at *6. The only theory of admissibility advanced by the State on appeal was that the statements were not hearsay because the testimonies tended to show responsive conduct and Woolheater's motive for being involved in the Morningstar murder. *Id.* at *10. The court of appeals rejected this theory, noting that in order to be admissible under that theory, the statement had to affect the recipient. *Id.* at *11–12. In *Huser I*, the statements were not offered "for the purpose of shedding light on the conduct of the person to whom [the statements were] made," but rather for the purpose of showing the conduct of the person *who made the statements*, which was not permissible under that theory of admissibility. *Id.* at *11.

At the second trial, the State did not offer testimony from Webb or Connett but did offer testimony from Mitrisin. As noted above, the State asked Mitrisin a series of questions about the August or September 2004 meeting between Huser and Woolheater at Woolheater's Quonset hut. The State asked several questions designed to elicit testimony that Woolheater talked about Huser, Deb, and Morningstar.

Huser claims the additional questions violated the district court's ruling on Huser's motion to suppress and that, as a result, Huser is entitled to a mistrial. In the alternative, Huser argues Mitrisin's entire testimony should have been stricken so that the inadmissible evidence would not be unduly highlighted. Finally, Huser argues the district court should have instructed the jury that "the State knowingly and intentionally asked improper questions" and that the testimony should not be considered or, in the alternative, that the information from the questions "would be unfavorable to the State and favorable to Vern Huser" or that "the State acted in bad faith by asking the questions, and you may draw any inference favorable to Mr. Huser."

There are three lines of inquiry arising out of the backdoor hearsay issue in this case. First, there is a threshold question of whether Huser timely objected to the admission of the Mitrisin testimony. If the objection was timely, the question arises whether the testimony challenged by Huser was inadmissible backdoor hearsay. If Huser timely objected and the challenged testimony was backdoor hearsay, the final issue is the appropriate remedy under the circumstances of this trial.

**B. Merits of Backdoor Hearsay Claim.**

1. *Timeliness of objection.* A threshold question is whether Huser timely objected to the introduction of the alleged backdoor hearsay. The State claims that Huser's counsel allowed the three questions to be asked and answered before making a timely objection. Had a timely objection been made, according to the State, the court could have ruled upon the issue before the testimony came into the record. Because of the failure to launch a timely objection, the State argues Huser has waived the issue.

Huser responds that no waiver occurred. Huser asserts the court's ruling on his motion to suppress clearly states Mitrisin's hearsay testimony that was rejected by the court of appeals in *Huser I* was inadmissible. Because the ruling was clear, Huser asserts no further objection was required. *See State v. O'Connell*, 275 N.W.2d 197, 202 (Iowa 1979) (holding when a motion in limine ruling "reaches the ultimate issue and declares the evidence admissible or inadmissible, it is ordinarily a final ruling and need not be questioned again during trial"); *State v. Edgerly*, 571 N.W.2d 25, 29 (Iowa Ct. App. 1997). Further, Huser argues experience shows that one should not immediately jump up and yell mistrial because it brings the attention of the jury to that issue. *See State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (involving a defendant who did not immediately object to improper testimony, but waited for the next break to request a mistrial, in order not to call attention to the testimony).

In our view, Huser's objection should be considered timely. The district court's ruling was unambiguous and declared that Mitrisin's hearsay testimony was not admissible. It was not a preliminary ruling but a final ruling of the court. *See O'Connell*, 275 N.W.2d at 202. Further, at the hearing on Huser's suppression motion, the State agreed that "the three statements designated as hearsay by the Iowa Court of Appeals will [not] be mentioned until a further hearing by the Court outside the presence of the jury."

We agree with the district court that, at a minimum, the State violated the spirit, if not the letter, of their stated agreement by attempting to indirectly achieve what the court of appeals and the district court had prohibited. A very brief delay in bringing the issue to the attention of the district court tended to minimize the damage done rather

than a contemporaneous display of fireworks that would have prevented any successful judicial intervention. Under the circumstances, we consider Huser's objection to the backdoor hearsay as timely.

2. *Standard of review for hearsay.* The standard of review with respect to the admission of hearsay evidence is for correction of errors at law. When hearsay is improperly admitted the error is presumed to be prejudicial unless the State shows the contrary. *State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011). The State may show improperly admitted evidence was not prejudicial by proving the error was harmless beyond a reasonable doubt. *State v. Sowder*, 394 N.W.2d 368, 372 (Iowa 1986).

3. *Admissibility of Mitrisin backdoor hearsay.* We now turn to the question of whether the State inappropriately introduced backdoor hearsay testimony into the record. In support of his position that improper backdoor hearsay was admitted, Huser cites several cases in which artful prosecution questioning was held impermissible as impliedly introducing hearsay into the record. *See United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994); *Check*, 582 F.2d at 679; *Schaffer v. State*, 721 S.W.2d 594, 597 (Tex. Ct. App. 1986).

At trial, the State suggested that admission of the hearsay was supported by an unpublished court of appeals opinion *Farrar*, 2011 WL 3480999 (majority opinion). On appeal, the State emphasizes *Farrar* as persuasive authority and claims the district court erred in determining the *Farrar* case was "unsupportive on the hearsay issue." Further, the State argues the testimony offered was not prohibited hearsay because it tended to show the connection between the defendant and the victim. *See State v. Frazer*, 267 N.W.2d 34, 37 (Iowa 1978) (ruling evidence showing a connection between the defendant and the victim on the night of the murder not hearsay).

In addition to this argument, the State argues that even if the testimony was improperly admitted, it was of such a limited amount that it did not prejudice Huser. The State notes only a portion of the hearsay ruled inadmissible in *Huser I* was introduced into the record upon retrial. The State argues that the relationships between Huser, Deb, Morningstar, and Woolheater were established by other evidence at trial, including (1) evidence of Deb's affair with Morningstar and Huser's widely expressed anger and upset after learning of the affair; (2) evidence that Huser met with Woolheater in the summer of 2004 and looked into Woolheater's background and weapons expertise; (3) evidence from cell phone records indicating that Woolheater and Huser made numerous phone calls from midsummer 2004 up to September 30, but very few after Morningstar's disappearance; (4) discovery of a note with Deb's new address in handwriting consistent with Huser's found in Woolheater's house; (5) evidence that Huser stated at a holiday party in December 2004 that Morningstar's body would be found when the snow melts; (6) evidence of Woolheater's comment to Webb after the body was discovered that Huser was one of three persons who knew about the body; and (7) evidence that after the discovery of Morningstar's body, Huser told a friend that he was "in big trouble."

While the State recognizes the defense argument that the timing of Mitrisin's testimony about the meeting between Huser and Woolheater in August or early September was especially prejudicial, the State notes there was evidence that Woolheater and Huser were together at a bar on September 25, five days prior to Morningstar's disappearance and thus the additional evidence of a Huser–Woolheater meeting at the Quonset hut added little to the record.

The district court agreed with Huser on the question of whether the State introduced prohibited hearsay. According to the district court, the law of the case holds Mitrisin's testimony that Woolheater told her "there was a guy messing around with Vern's wife or ex-wife . . . and [Huser] wanted this guy roughed up" is hearsay. According to the district court, the statements elicited from Mitrisin in the second trial "were obviously derived from the full statement that was declared hearsay by the court of appeals in the first trial." The district court further reasoned, "Although the statement introduced at the first trial is only a part of the full hearsay statement, it was still prohibited under the law of the case." The district court concluded, "To rule differently would allow the State to dissect a hearsay statement into smaller statements and introduce statements in the form of yes or no answers."

There are three cases dealing with what Huser refers to as backdoor hearsay. For instance, in *Reyes*, the prosecution asked a series of questions of a government agent designed to determine if "discussions" and "conversations" with two defendants led the agent to believe that other persons were involved in criminal activity. 18 F.3d at 67–68. The government also asked an agent to describe the significance of numbers on a matchbook cover, which elicited testimony that one of the defendants had told the agent that the numbers "were beeper numbers for two people in Columbia that he was to get in contact with." *Id.* at 68. The defense objected on hearsay grounds. *Id.* The government contended that because the words of the declarant were not repeated, the testimony was not hearsay. *Id.* at 69. Further, the government claimed the only purpose of the testimony was to show the impact of the testimony on the agent. *Id.*

The United States Court of Appeals for the Second Circuit rejected the argument, noting that the agent's testimony clearly communicated the substance of what the declarant had said. *Id.* The *Reyes* court noted that while the district court gave a limiting instruction on the use of the evidence, the limiting instructions were unlikely to prevent the jury from using the evidence for its truth. *Id.* at 72. The *Reyes* court concluded that the government was unable to show the evidence was harmless. *Id.*

As a result, the *Reyes* court reversed the conviction. *Id.* The *Reyes* court closed its opinion with an admonition to prosecutors that the need for a retrial could have been avoided if the government, recognizing the incendiary nature of the evidence, had begun by a proffer, preferably in writing, explaining the issues in full, thereby giving the defendant a chance to object and the trial court an opportunity to rule before the damage had been done. *Id.*

Another Second Circuit case involving backdoor hearsay is *Check*, 582 F.2d 668. In *Check*, an undercover officer was asked to testify about conversations with the defendant. *Id.* at 670. The prosecutor attempted to avoid hearsay by phrasing his questioning as follows: "Without telling us what [the defendant said to you], what did you say to [the defendant]." *Id.* at 671. Through this strategy, the government indirectly introduced into the record extensive evidence that Check was involved in narcotics transactions. *Id.* at 678–79.

The *Check* court then turned to the question of prejudice. *Id.* at 683. The *Check* court emphasized the test of whether the hearsay evidence was harmless was not whether there was other evidence that was independently sufficient to establish the defendant's guilt. *Id.* at 683–84. The test was whether the error influenced the jury. *Id.* at 684.

According to *Check,* error is harmless only if the court is sure the evidence did not influence the jury or had only slight effect. *Id.*

A state appellate court considered a backdoor hearsay problem in *Schaffer,* 721 S.W.2d 594. In *Schaffer,* the prosecutor used the "without telling us what [the defendant] told you" format to inquire whether the officer would ask the state to drop the charges after talking to a person who would have knowledge about the validity of the defendant's defense. *Id.* at 597. The officer answered, "No, Sir." *Id.* The *Schaffer* court noted that while the question and answer did not produce hearsay "in the classic or textbook sense," the questioning was nevertheless designed to circumvent the hearsay rule and present the jury with information from unsworn, out-of-court sources. *Id.* The *Schaffer* court declared that such backdoor hearsay should be subject to the same rules and limitations as its more common form. *Id.* Finding a reasonable possibility that the jury was influenced by the testimony, the *Schaffer* court reversed the conviction and remanded the case for a new trial. *Id.*

We think it clear that the State was attempting to circumvent the ruling in *Huser I* by giving rise to an inference that Huser and Woolheater were talking about Deb and Morningstar at the Quonset hut in late August or early September. Mitrisin, of course, had no personal knowledge about what Huser and Woolheater discussed. Indeed, she had no personal knowledge sufficient to identify Huser. While the defense was willing to allow testimony that Huser and Woolheater were together at the Quonset hut, the defense did not consent to innuendo about the subject matter of the Huser–Woolheater meeting.

We recognize that the form of the question did not literally require the jury to infer the subject matter of the meeting. But the use of the "don't tell me what he said" questioning directly after Mitrisin testified

about the Quonset hut meeting was designed to encourage the jury to make the connection. In *State v. Carey*, we noted that the state

> is not permitted by means of the insinuation or innuendo of incompetent and improper questions to plant in the minds of the jurors a prejudicial belief in the existence of evidence which is otherwise not admissible and thereby prevent the defendant from having a fair trial.

165 N.W.2d 27, 32 (Iowa 1969) (quoting *State v. Haney*, 18 N.W.2d 315, 317 (Minn. 1945)). Here too, through a questioning strategy, the State sought to leave the impression with the jury about the existence of inadmissible evidence. We therefore conclude that the questioning violated the ruling of the district court in the motion to suppress through a backdoor strategy.

### C. Appropriate Remedy.

1. *The district court's approach to backdoor hearsay.* From our reading of the record, the district court was prepared to strike the last three questions and answers of Mitrisin's testimony and admonish the jury to disregard it. Huser, however, feared that any admonition would simply serve to emphasize the improperly admitted evidence. Although the district court rejected Huser's request for more muscular remedies, the district court did order the prosecution not to refer to the testimony in its closing statement.

2. *Motion for mistrial.* Huser's first requested remedy was a mistrial. According to Huser, the damage to him was complete by the very admission of the backdoor hearsay. The hearsay bell could not be unrung. As a result, Huser believed that a mistrial was required. The State countered that the admission of the evidence had minimal prejudice, and the district court agreed. According to the State, the record contained other evidence amply demonstrating the connections

between Huser, Morningstar, and Woolheater. Huser argues the district court abused its discretion by failing to grant the motion for mistrial under all the circumstances.

Ordinarily when hearsay evidence is admitted into the record, a district court may address the problem by striking the inadmissible testimony and admonishing the jury to disregard it. *State v. Williamson*, 570 N.W.2d 770, 771 (Iowa 1997). The question is whether, under the circumstances of this case, the ordinary remedy was insufficient to ensure the defendant received a fair trial.

Generally, a trial court has wide discretion in granting or denying a mistrial. *State v. Trudo*, 253 N.W.2d 101, 106 (Iowa 1977). A trial court's exercise of discretion may be reversed on appeal only when it is demonstrated that the discretion of the trial court "was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Brewer*, 247 N.W.2d 205, 211 (Iowa 1976) (quoting *State v. Blackwell*, 238 N.W.2d 131, 138 (Iowa 1976)). We have held that when evidence admitted contrary to a prior court ruling was promptly stricken and the jury admonished to disregard it, a mistrial may be granted only when the matter forbidden is so prejudicial that its effect upon the jury could not be erased by the trial court's admonition. *State v. Jackson*, 587 N.W.2d 764, 766 (Iowa 1998); *State v. Mattingly*, 220 N.W.2d 865, 870–71 (Iowa 1974).

Our cases reveal several examples when we have granted mistrials when the improper evidence came into the record and a curative instruction would have been insufficient to remove the prejudice. For example, in *State v. Oppedal*, we granted a new trial in a prosecution for possession of marijuana when the state offered evidence that a third-party approached the door of the defendant with three pounds of

marijuana without showing any connection between the defendant and the three pounds of marijuana. 232 N.W.2d 517, 519, 524 (Iowa 1975).

We also granted a mistrial in *Carey*, 165 N.W.2d 27. In *Carey*, the state sought to create through questioning the innuendo that the defendant was responsible for the unavailability of key witnesses. *Id.* at 31. We held the state "is not permitted by means of insinuation or innuendo of incompetent and improper questions to plant in the minds of the jurors a prejudicial belief in the existence of evidence which is otherwise not admissible and thereby prevent the defendant from having a fair trial." *Id.* at 32 (quoting *Haney*, 18 N.W.2d at 317). This transaction, when combined with other trial problems, had the cumulative effect of depriving the defendant of a fair trial. *Id.* at 36.

Another case of interest is *State v. Belieu*, 288 N.W.2d 895 (Iowa 1980). In *Belieu*, the defendant was being tried jointly with two codefendants. *Id.* at 896. The defendant made a motion to sever, which was denied, and the defendant's codefendants introduced evidence of prior criminal activity by the defendant as part of their defenses to the crime. *Id.* at 898. We held that the improper evidence was so pervasive and central to the issues of the case that its prejudicial effect could not be reasonably cured by a limiting instruction. *Id.* at 901–02. The defendant had no way of protecting himself at trial against this prejudicial impact, nor was the evidence brief or inadvertent and promptly stricken from the record. *Id.* at 901.

Precedents from other states also provide some guidance. In *State v. Veatch*, an Oregon appellate court considered whether the state's offer of inadmissible evidence required a new trial. 196 P.3d 45, 47 (Or. Ct. App. 2008). In *Veatch*, the defendant was charged with operating a motor vehicle while intoxicated. *Id.* In response to questioning by the

state, the arresting officer testified the defendant sought to consult with a lawyer before taking a breath test. *Id.* at 48. The defendant objected. *Id.* The trial court sustained the objection and admonished the jury not to consider the testimony. *Id.* The defendant moved for a mistrial, which was denied. *Id.* at 48–49.

On appeal, the *Veatch* court reversed. *Id.* at 55. According to the Oregon court, the testimony that the defendant sought the advice of an attorney gave rise to an adverse inference of guilt because the jury would infer that the defendant would fail the breath test. *Id.* at 54. The court explained that "once a juror has drawn the inference that the defendant tacitly admitted guilt, it would be exceedingly difficult to disregard both the evidence that gave rise to that inference and—more importantly—the inference itself." *Id.* at 55. As a result, the Oregon appellate court held the district court abused its discretion in denying a mistrial. *Id.*

A mistrial has often occurred in the context of improper admission of prior bad acts. For instance, in *Jones v. State*, the state introduced evidence of the defendant's prior felony convictions. 128 So. 3d 199, 200 (Fla. Dist. Ct. App. 2013) (per curiam). Jones objected each time, but strategically declined a curative instruction because such an instruction would be "like putting the fire out with gasoline." *Id.* Instead, Jones moved for a mistrial, which was denied by the trial court. *Id.* The trial court, however, gave an instruction to the jury to disregard the evidence of prior felonies. *Id.*

The Florida appellate court reversed. *Id.* at 201. According to the appellate court, the prejudice was so severe that the judge's curative instruction was insufficient. *Id.* The appellate court emphasized that the prejudice was obvious. *Id.* Further, the fact the jury inquired about the felony convictions showed that they were influenced by the testimony.

*Id.*; *see also State v. Vallejo*, 965 A.2d 1181, 1187–89 (N.J. 2009) (holding curative instruction inadequate when evidence of prior crimes was admitted).

On balance, we cannot conclude the district court abused its discretion in refusing to grant a mistrial. In doing so, it is important to consider the difference between the hearsay evidence offered in Huser's first trial with that offered in the second trial. In the first trial, Mitrisin testified she observed Huser and Woolheater meet and that afterwards Woolheater told her that Huser wanted Woolheater to "rough up" Morningstar because of the affair between Morningstar and Huser's ex-wife. *Huser I*, 2011 WL 6079120, at *4. Here, Mitrisin only testified she saw Huser and Woolheater meet and that at some point Woolheater spoke about Huser, Deb, and Morningstar. While the testimony offered by the State might be construed to imply that Huser and Woolheater discussed Deb and Morningstar at the time of the meeting, it did not include the highly prejudicial testimony that Huser wanted Woolheater to "rough up" Morningstar that was admitted in the first trial. Moreover, the three improper questions were a very small part of the fourteen-day trial with forty-five witnesses. Finally, the district court ordered the State to make no reference to the testimony in its closing argument, and the State complied. Under the circumstances, we do not believe the evidence was so flagrantly prejudicial that the district court abused its discretion in denying a mistrial.

We do, however, wish to emphasize the cautionary note in the *Reyes* case with regard to potentially prejudicial evidentiary matters. *See* 18 F.3d at 72. The wisest course for the prosecution when there is a real question of whether a proposed interrogation will run afoul of a motion in limine or other order of the court, is to present the issues to the district

court for prior determination rather than spring the issue on the court and the parties. By declining to do so in this case, the prosecution assumed a significant risk that a favorable verdict would be undermined by evidentiary error. That the State has avoided such a result here should not sanction or encourage the hide-the-ball approach of the State in this case.

3. *Motion to strike entirety of Mitrisin testimony.* After the district court ruled the State improperly introduced hearsay through Mitrisin but declined to grant a mistrial, Huser's counsel and the State agreed to try to develop an admonition to the jury. The attempt ended in failure, however, and Huser asked the district court to strike Mitrisin's entire testimony in the alterative to granting a mistrial. The advantage of this approach was that it would tend to lessen the jury's attention to the improperly admitted evidence. The district court rejected this approach.

Mitrisin's testimony was not extensive. She did establish without objection that Woolheater and Huser met at the Quonset hut in late August or early September. At the time, however, Mitrisin did not know who Huser was, and she was able to identify Huser only because Woolheater told her that the man was Huser.

This evidence, though of some use to the State, was hardly critical to its case. Through other witnesses, the State had established that Woolheater and Huser knew each other, they were in telephonic communication in September, and they were friendly enough that on September 25 Huser allowed Woolheater to use his cell phone to call his girlfriend to get a ride home from a bar after becoming intoxicated. The striking of Mitrisin's entire testimony would have tended to lessen the prejudice caused by her inadmissible testimony without significantly undermining the State's case.

Yet, we cannot conclude the district court abused its discretion by declining to strike the entirety of the testimony. We think the district court's rejected offer of striking the offending questions and answers, accompanied by an appropriate admonition, would have been sufficient under the facts and circumstances of this case. We come to this conclusion because of the vagueness of the testimony offered, its limited scope, and our trust that a jury can ordinarily follow the court's instructions. The evidence that leaked into the record was simply not so incendiary as to require a different result.

4. *Request for a curative instruction.* As a second alternative to a mistrial, Huser proposed a strong curative instruction that would, in effect, penalize the State for its conduct. According to Huser, the district court should have "counterbalanced" the prejudicial evidence by instructing the jury that the State "knowingly and intentionally asked improper questions," and therefore the jury should not consider the testimony. Alternatively, Huser asked for an instruction indicating that "information from the questions would be unfavorable to the State and favorable to Vern Huser" or "the State acted in bad faith by asking the questions, and you may draw any inference favorable to Mr. Huser." The district court declined to give the proposed instructions.

A court's decision not to give a requested instruction is reviewed for correction of errors at law. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). Failure to give an appropriate instruction warrants reversal unless the record shows the absence of prejudice. *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010), *overruled on other grounds by Alcala*, 880 N.W.2d at 708 n.3. We have said that "[w]hen the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been

injuriously affected or that the party has suffered a miscarriage of justice." *Id.* (quoting *State v. Gansz*, 376 N.W.2d 887, 891 (Iowa 1985)).

It is important to keep in mind the context in which the issue of curative instruction arises. Shortly after the Mitrisin testimony was introduced, the district court appeared willing to strike the testimony and give an appropriate admonition. Huser did not think that sufficient to cure the prejudice and instead sought a stronger remedy of mistrial and exclusion of the entire Mitrisin testimony. The district court denied these remedies. Later, the State and the defense attempted to develop an appropriate instruction for the jury, but no agreement was reached. After the efforts were unsuccessful, Huser proposed the above jury instructions.

We do not find the refusal of the district court to instruct the jury as proposed by Huser to be reversible error. The district court found that the State had not knowingly and intentionally asked improper questions, and thus there was no basis for the first version of the proposed instruction. Although the State's approach was arguably less than candid and certainly not forthcoming, we conclude the State had a good-faith basis for believing that the evidence it was about to offer was not hearsay and thus would not violate the district court's order suppressing the hearsay held inadmissible in *Huser I.*

To the extent the State suggested below that the majority in *Farrar* endorsed its position, that suggestion is plainly incorrect. The majority in *Farrar* stands for the proposition that the failure to object to the proffered hearsay testimony could amount to ineffective assistance, a position that plainly assumed the evidence admitted at trial should have been excluded. 2011 WL 3480999, at *3. The concurring opinion in *Farrar,* however, took the position that the underlying testimony was not

hearsay at all. *Id.* (Vogel, P.J., concurring specially). The reasoning of the concurring opinion, though not adopted by the court in *Farrar*, provided the State with a good-faith basis for the proposition that its proffered evidence was not hearsay.

We now turn to the second curative instruction proposed by Huser. The first variation of the second proposed curative instruction states that the information obtained from the questions posed by the State would be unfavorable to the State and favorable to Huser. However, such an assertion is simply not true. Indeed, it is the unfavorable impact of the Mitrisin testimony that caused Huser to seek a mistrial.

We cannot endorse a "fight fire with fire" approach that misstates the facts. Such an approach would undermine the integrity of the tribunal. If such an inaccurate instruction is required to balance the playing field, the proper remedy is not an inaccurate instruction but a mistrial. *See State v. Ware*, 205 N.W.2d 700, 704–05 (Iowa 1973) (holding evidence of coerced confession—which was struck and the jury admonished to disregard—was so prejudicial that striking and admonishing could not cure).

Similarly, the second variation of the proposed curative instruction advising the jury that the State was acting in bad faith and that the jury was free to draw any inference favorable to Huser was not a balanced instruction designed to promote a fair trial but was unnecessary overkill. The district court did not abuse its discretion in refusing to give such an instruction under the facts and circumstances of this case.

**IV. Admissibility of Woolheater's Statements to Zwank and the "Open the Door" Issue.**

**A. District Court Proceedings.** At Huser's second trial, the tables were reversed when Huser sought to introduce hearsay evidence of

statements by Woolheater. Specifically, Huser sought to introduce statements made by Woolheater to Zwank that Woolheater told her Morningstar had information against Woolheater that could put Woolheater in jail, that "Ricky and Mark" were going to help Woolheater take care of Morningstar, and that "Ricky made one hell of a shot" on the night of September 30. Before the district court, Huser argued that Woolheater's statements to Zwank were admissible as statements against interest or as statements to a coconspirator in furtherance of a conspiracy.

The State responded that if Woolheater's statements to Zwank came into the record, Woolheater's statements to Webb, Connett, and Mitrisin should also be admissible. According to the State, "it shouldn't be allowed for the defense to be able to get into [Woolheater's statements to Zwank] if the State can't [get into Woolheater's statements to Mitrisin, Webb, and Connett]." The State argued that if Woolheater's statements to Zwank were admissible as statements against interest, the statements to Mitrisin, Webb, and Connett were also statements against interests. As to the coconspirator theory, the State argued the evidence did not support a conspiracy between Zwank and Woolheater at the time the statements were made.

The hearing at the district court first focused on Huser's coconspirator theory. Huser argued that while Zwank was a coconspirator with Huser, Mitrisin, Webb, and Connett were not coconspirators. As a result, he claimed, Zwank's testimony was admissible but not the testimony of the State's witnesses.

The district court responded, however, by indicating that if Zwank's testimony came into the record "it does open the door" to testimony from Mitrisin, Webb, and Connett. In any event, the district

court stated, "I'm not convinced that I can say that by a preponderance of evidence that this witness is a coconspirator."

Huser then urged admission of at least part of Woolheater's statements to Zwank as statements against interest. In response, the district court stated, "Well, again, my perspective . . . is that you can't use it as a shield and a sword at the same time. . . . So what's good for the goose is good for the gander." At this point, the district court declared, "So my ruling is, I'm not going to rule that she's a coconspirator in this particular case. And if you want to go into these other statements, then I think that does open the door."

After this ruling from the district court, Huser made his offer of proof. In the offer of proof, Zwank testified that a couple of days before she arrived in Des Moines on September 30, Woolheater told her Morningstar had something against him that could send him to jail and that Ricky and Mark were going to deal with Morningstar. On the evening of September 30, Zwank testified that while she waited for Woolheater after dropping him off near the Morningstar residence, she received a communication from Woolheater stating "they're here." Once Zwank picked up Woolheater, he stated, "Ricky made one hell of shot." After the incident on September 30, Zwank testified that Woolheater again told her that he had to take care of Morningstar because he had something on him concerning his past.

After the offer of proof, the district court stated, "[M]y reaction is that you are entitled to go there, but it opens the door." Huser's counsel stated, "I understand that Judge. And I will tell the court that I will not, at this point, go into that."

**B. Positions of the Parties.** On appeal, Huser maintains that the Woolheater hearsay to Zwank is admissible as "inextricably intertwined"

evidence or "res gestae" and therefore not excluded under Iowa Rule of Evidence 5.404(*b*) (2013). Second, Huser argues that Woolheater's comments were admissible as statements of a coconspirator in furtherance of a conspiracy under Iowa Rule of Evidence 5.801(*d*)(2)(E). Finally, Huser maintains that Woolheater's comments to Zwank were admissible as admissions against interest under Iowa Rule of Evidence 5.804(*b*)(3).

Huser asserts that he was prejudiced by the exclusion of Zwank's testimony. Huser notes that in rebuttal, the State stressed it was undisputed that Woolheater pulled the trigger on the gun that killed Morningstar. Huser points out the State further stated in its rebuttal argument that "there isn't any question of the motivation behind the action. Vern Huser wanted Lance Morningstar dead." Had the Zwank testimony been admitted, Huser argues, the State could not have made the unqualified argument that "there isn't any question" behind the motive for Morningstar's murder. If Woolheater's declarations to Zwank were admitted, the defense would have been able to argue there was evidence that Woolheater had a motive independent of Huser. Under the circumstances, according to Huser, the State cannot show that the erroneous exclusion of evidence did not result in prejudice. *See State v. Traywick*, 468 N.W.2d 452, 454–55 (Iowa 1991).[2] In his appellate briefing, however, Huser does not address the question of whether the admission of Woolheater's statement to Zwank would open the door to

---

[2]On appeal, Huser also asserts the failure of the trial court to admit the hearsay testimony of Zwank violated due process. The State correctly points out that the due process claim was not raised in the district court. Huser thus waived his constitutional claim. *See Tangie*, 616 N.W.2d at 569.

unfavorable statements made by Woolheater to Mitrisin, Connett, and Webb.

The State's response to Huser's argument regarding the admissibility of Woolheater's statements to Zwank is also brief. According to the State, Huser's inextricably intertwined argument does not apply because the doctrine ordinarily allows admission of a second offense to "complete the story." *State v. Nelson*, 791 N.W.2d 414, 419–20 (Iowa 2010). Here, according to the State, there is no second offense and thus the inextricably intertwined exception does not apply. The State further argues the district court correctly found there was no conspiracy between Woolheater and Zwank. At most, the State asserts, Zwank may have been an accessory after the fact, but there was no agreement between Woolheater and Zwank that amounted to a criminal conspiracy. The State does not address in its appellate brief the question of whether Zwank's testimony was an admission against interest.

The State further declares the biggest hurdle to admission of the Zwank testimony is the fact that on the first appeal Huser succeeded in excluding Woolheater's statements about Woolheater's motive made to Mitrisin, Connett, and Webb. The State points out that at the district court, the prosecution insisted that the admission of Woolheater's statements of motive should be "all or nothing." The State noted the district court questioned whether the admission of the Zwank hearsay testimony "opened the door" and cites the district court's observation that "you can't use it as a shield and a sword at the same time here."

Finally, the State suggests that Huser was not prejudiced by the lack of admission of the Zwank hearsay. The State notes that Zwank would have been subject to cross-examination, and the fact that Woolheater may have had an independent motive would not have

prevented the State from arguing Huser was a key connection between Woolheater and Morningstar.

### C. Discussion.

1. *Admission under the inextricably intertwined theory.* We reject the notion that the Zwank testimony was admissible under the inextricably intertwined theory. As noted by the State, Huser did not present the theory to the district court and thus the issue has been waived. In any event, the inextricably intertwined doctrine is a narrow exception reserved for situations in which evidence of another crime is admitted because of necessity in explaining the underlying crime charged. As stated in *Nelson,* the doctrine applies only when "a court cannot sever this evidence from the narrative of the charged crime without leaving the narrative unintelligible, incomprehensible, confusing, or misleading." 791 N.W.2d at 423. It has no application in this case.

2. *Admission as a statement in furtherance of a conspiracy.* Iowa Rule of Evidence 5.801(*d*)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. A conspiracy is "a combination or agreement between two or more persons to do or accomplish a criminal or unlawful act, or to do a lawful act in an unlawful manner." *State v. Tonelli*, 749 N.W.2d 689, 692 (Iowa 2008) (quoting *State v. Ross*, 573 N.W.2d 906, 914 (Iowa 1998)). A conspiracy must be established by a preponderance of the evidence. *Tangie*, 616 N.W.2d at 569. When a trial court makes a determination on the question of whether a conspiracy exists, we review the trial court's determination for substantial evidence. *In re Prop. Seized from DeCamp*, 511 N.W.2d 616, 621 (Iowa 1994).

The district court concluded that Huser failed to show a conspiracy between Woolheater and Zwank by a preponderance of the evidence.

Based on our review of the record, we find there is substantial evidence to support the district court's conclusion. The record reflects that Zwank was interested in spending her birthday with Woolheater and drove to Des Moines for that purpose. There was no evidence in the record Zwank agreed with Woolheater that an unlawful act needed to be accomplished with respect to Morningstar. She drove Woolheater to the vicinity of Morningstar's house at Woolheater's direction; but arguably, she did so hoping that Woolheater would finish his business and spend time with her.

By attempting to help Woolheater load the body into the trunk of her vehicle and helping Woolheater load Morningstar's tractor onto Woolheater's truck, Zwank may well have been aiding and abetting the criminal acts of Woolheater, but aiding and abetting and conspiracy are different concepts. While the district court could have come to a different conclusion, we do not find the district court's ruling on the question clearly erroneous or not supported by substantial evidence. *See State v. Long*, 628 N.W.2d 440, 445 (Iowa 2001).

3. *Admission as a statement against interest.* On the question of admission against interest under Iowa Rule of Evidence 5.804(*b*)(3), we conclude Huser is on firmer ground. The parties agreed that Woolheater was unavailable to testify at the trial, a prerequisite to the hearsay exception. In order to qualify as a statement against interest, a person does not need to confess to a crime. *Paredes*, 775 N.W.2d at 566. All that is required is that the hearsay statements tend to expose the declarant to criminal liability, thereby providing an indicium of reliability. *Id.*

An important aspect of Woolheater's statement to Zwank was his declaration that Morningstar had something on him that might send him

back to jail. Statements of motivation for criminal acts have been held to qualify as statements against interest. For instance, statements by declarants that the victim was shot because he was a bully, that the fire was set to destroy evidence, and that a house of prostitution was burglarized with intent to commit a robbery, have all been held admissible as statements against interest. *See People v. Jackson*, 1 Cal. Rptr. 2d 778, 783 (Ct. App. 1991); *State v. Morales*, 788 N.W.2d 737, 766 (Minn. 2010); *People v. Pierre*, 11 N.Y.S.3d 389, 391 (App. Div. 2015).

In order to be admissible, statements against interest must be clearly supported by corroborating circumstances. *Paredes*, 775 N.W.2d at 561. Corroborating circumstances, of course, does not mean that there must be redundant evidence in the record supporting the statement made by the declarant. Instead, all that is required is that there exists a reasonable possibility that the declarant's statement might be true. *Id.*

In *Paredes*, we adopted a multifactor test similar to that employed in other jurisdictions to determine whether a statement was sufficiently corroborated to be admissible under the statement against interest exception. *Id.* at 568. Among the factors to be considered are whether the declarant had any apparent motive to misrepresent the matter, the character of the declarant, the timing of the declaration, whether the declaration was made spontaneously, the relationship between the declarant and the party to whom the declaration was made, and whether other people heard the out-of-court statement. *Id.*

One of the factors often cited in the caselaw as tending to establish corroboration is when the declaration is made to a friend or close associate in a noncoercive setting. *See Thomas v. United States*, 978 A.2d 1211, 1231 (D.C. 2009) (agreeing the fact that the declarant made

the statement to his brother's girlfriend was a corroborating circumstance); *Maugeri v. State,* 460 So. 2d 975, 978 (Fla. Dist. Ct. App. 1984) (holding declaration made to girlfriend admissible). Here, Woolheater's statement was made to his girlfriend, Zwank. This corroborating circumstance cuts in favor of admissibility.

Closeness of the declaration to the crime and its spontaneity may be a corroborating circumstance. *See People v. Wilcox,* 941 N.E.2d 461, 476 (Ill. App. Ct. 2010); *State v. Cazares-Mendez,* 256 P.3d 104, 117 (Or. 2011) (en banc). This factor also cuts in favor of admissibility of Woolheater's comments to Zwank.

Most importantly, however, there is ample circumstantial evidence connecting Woolheater to the crime. Indeed, he was ultimately convicted of first-degree murder because of the strength of the evidence against him. As emphasized in *Paredes,* if a nexus exists between the declarant and the time and place of the crime and the statement has "substantial plausibility," the proponent has met the corroboration requirement. 775 N.W.2d at 568.

This is not a case in which a remote party is seeking to divert blame under an attenuated theory of guilt. Although some jurisdictions have held that statements prior to the crime are not admissible because they do not expose the declarant to criminal liability—*see Varble v. Commonwealth,* 125 S.W.3d 246, 253 (Ky. 2004) and *State v. Espinosa,* 43 P.3d 1155, 1163 (Or. Ct. App. 2002)—Woolheater made statements to Zwank after the crime that tend to expose him to criminal liability; for example, "Ricky made a hell of a shot." Thus, at least some of Woolheater's declarations to Zwank appear to be admissible as statements against interest.

4. *Entitlement to relief.* Yet, the mere fact that at least some of the Zwank testimony is admissible as a statement against interest does not, in and of itself, provide Huser with an avenue for relief. From our reading of the record, the district court was prepared to allow the admission of the Zwank testimony, but held that the introduction of the Zwank testimony would "open the door" to Woolheater's statements to Webb, Mitrisin, and Connett. Specifically, the district court stated at the hearing, "[I]f you want to go into these statements [to Zwank], I think that does open the door." After the offer of proof, the district court stated, "[M]y reaction is that you are entitled to go there, but it opens the door." Huser did not move the Zwank testimony be admitted. Huser seems to have believed if the choice were all or nothing, nothing was the better approach.

On appeal, Huser does not address the district court's ruling that the testimony of Zwank would "open the door." Huser asserts that Woolheater's statements to Zwank are admissible under various exceptions to the hearsay rule, but does not directly address the question of whether the district court was correct in indicating that admission of the Woolheater statements to Zwank meant the other, less favorable Woolheater hearsay statements to Mitrisin, Webb, and Connett would also be admissible. The State briefly provides a narrative of the district court's approach to the issue, but does not provide any analysis or caselaw to support the district court's "all or nothing" theory.

But a critical issue before the district court, however, was whether the admission of the favorable Zwank testimony meant the admission of unfavorable testimony from Webb, Mitrisin, and Connett under an open-the-door theory. The key ruling of the district court was thus not on the admissibility of the Zwank testimony, but on its ruling that other less

favorable hearsay would subsequently become admissible. The price of admission, literally, was too high for Huser, and he did not pursue the matter further at trial.

What exactly the district court and the parties meant when they used the catchy phrase "open the door" is unclear. *See* Charles Alan Wright & Kenneth W. Graham Jr., 21 *Federal Practice & Procedure* § 5039, at 829 (2d ed. 2005) [hereinafter Wright] ("[C]ourts continue to throw around such 'notoriously imprecise' terms as 'opening the door', 'invited error', 'curative admissibility', 'fighting fire with fire'—and, yes, 'waiver.' ").

The phrase "open the door" is sometimes used as a reference to the doctrine of curative admissibility. The doctrine of curative admissibility, however, only applies when inadmissible evidence has been entered into the record and the other party seeks to admit further inadmissible evidence to cure the error. This is what is colloquially referred to as the "fight fire with fire" theory. *See Lala v. Peoples Bank & Trust Co. of Cedar Rapids*, 420 N.W.2d 804, 807–08 (Iowa 1988) (recognizing the doctrine of curative admissibility when inadmissible evidence is introduced into the record and opposing party is allowed to offer inadmissible evidence to cure the problem); *Vine St. Corp. v. City of Council Bluffs*, 220 N.W.2d 860, 864 (Iowa 1974) ("[W]hen one party introduces inadmissible evidence the opponent under proper circumstances may be entitled to rebut this proof by other inadmissible evidence."); Wright, 21 *Federal Practice & Procedure* § 5039.3, at 847.

There is authority that in the purest sense, the doctrine of "opening the door" is a reference to situations in which the admission into the record of admissible evidence is a prerequisite for introduction of other evidence. A party opens the door by offering admissible evidence

that in turn triggers admissibility of responsive evidence by an opposing party. For example, when a criminal defendant introduces evidence of good character, such evidence opens the door to the admission of bad character evidence by the state. Iowa R. Evid. 5.404(*a*)(1); *see* Wright, 21 *Federal Practice & Procedure* § 5039.1, at 835. The pure notion of opening the door does not quite fit here unless the State can establish an exception to the hearsay rule that would allow the admission of Woolheater's statements to Mitrisin, Webb, and Connett. The State did not undertake such an effort before the district court or on appeal.

However, the rule of completeness in Iowa Rule of Evidence 5.106 might be characterized as posing an open-the-door concept. *See State v. Keith*, 618 A.2d 291, 293 (N.H. 1992) (characterizing similar state rule of evidence as involving an open-the-door concept). Under rule 5.106, admission of evidence of a conversation may lead to admission of evidence of any other conversation "when necessary in the interest of fairness, a clear understanding, or an adequate explanation." Iowa R. Evid. 5.106(*a*). The Iowa rule is broader than the federal counterpart in Federal Rule of Evidence 106, which applies only to all or part of writing or recorded statement. The Iowa rule allows admission of "any other . . . conversation" that meets the rule's requirements. *Id.*

Although the concept of opening the door was repeated by the parties and the district court, no one mentioned rule 5.106 at the hearing in the district court. And, not surprisingly, there are no express findings under the rule. Had rule 5.106 been raised, there might be interesting issues regarding whether the requirement of necessity had been met and whether the scope of the rule allowed introduction of all, some, or none of the hearsay statements Woolheater made to Mitrisin, Webb, and Connett.

For instance, the statements of Mitrisin, Webb, and Connett arguably do not refer directly to the subject of Morningstar possessing information that could send Woolheater to jail, but may relate to a *different* subject matter, namely Huser's alleged desire to have Morningstar "roughed up." The rule states that any other conversation "is admissible when necessary in the interest of fairness, a clear understanding, or an adequate explanation." *Id.* But in fairness, a clear understanding, or an adequate explanation of what exactly? Is it limited to understanding the prior statement itself, explaining it, or providing an understanding of it, or correcting a misimpression in the statement? *See Johnson v. State*, 823 So. 2d 1, 39 (Ala. Crim. App. 2001) (stating doctrine of completeness only applies to a single conversation); *State v. Keough*, 18 S.W.3d 175, 182–83 (Tenn. 2000) (holding Tennessee's version of rule 5.106 did not apply to defendant's subsequent statements made to other individuals).

So construed, the statements of Mitrisin, Webb, and Connett do not complete the Zwank testimony at all. They do not explain how Morningstar had damaging information on Woolheater or correct a misleading impression that Woolheater might go to jail if Morningstar disclosed information to authorities. There is no suggestion that Zwank reported part of Woolheater's statements or that her testimony took the statement out of context. It was arguably not, in the colorful words of one federal court, "a misleadingly tailored snippet." *United States v. Castro-Cabrera*, 534 F. Supp. 2d 1156, 1160 (C.D. Cal. 2008) (quoting *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996)). A narrower gloss is consistent with *Knudsen v. Chicago & North Western Transportation Co.*, where we allowed additional testimony about a singular event—a prior phone call—under rule 106, the predecessor of

rule 5.106. 464 N.W.2d 439, 443 (Iowa 1990); *see also State v. Campbell,* 582 P.2d 783, 785 (Mont. 1978) (holding under rule of completeness, balance or portions of the same document, correspondence, or conversation may be admitted, but not all hearsay communications regarding what the informant may have told law enforcement).

Phrased differently, the question is what, exactly, is being made complete under rule 5.106. As noted by one commentator, deciding what is complete raises a difficult question. 1 Barbara E. Bergman & Nancy Hollander, *Wharton's Criminal Evidence* § 4.10, at 319 (15th ed. 1997). Yet, in order to apply this type of rule, a decision must be made as to "what grouping constitutes a fair and reasonably complete unit of material." *United States v. Boylan,* 898 F.2d 230, 257 (1st Cir. 1990).

Using the *Boylan* formulation, is the unit of material here Woolheater's statement to Zwank that Morningside had something on him that could land him in jail? *See United States v. Moussaoui,* 382 F.3d 453, 482 (4th Cir. 2004) (holding rule cannot be used to gain admission of statements that "neither explain nor clarify the statements designated by [the opposing party]"); *see also* 7 Laurie Kratky Doré, *Iowa Practice Series™: Evidence* § 5.106:1, at 95 (2016–2017 ed.) [hereinafter Doré] ("[T]he rule requires a demonstration that additional evidence is necessary to a proper understanding of the *admissible primary evidence.*" (Emphasis added.)).

Or is there a broader unit of material, namely, the general question of why Woolheater killed Morningstar? Can rule 5.106 be extended to allow the opposing party not only to provide the full context of a prior statement, but also to attack the veracity of the statement through other statements made at a different time and place to different parties? If so,

does the rule of completeness eviscerate the law of evidence generally by becoming a license to admission of otherwise inadmissible evidence when the defendant extracts an ounce of favorable testimony?

There are other issues. There is the question of whether rule 5.106 serves primarily a timing function or a trumping function. Some federal courts have held that the federal rule of completeness is designed only to deal with order of proof, or timing of admission, and not "to make something admissible that should be excluded." *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982). *But see United States v. Bucci*, 525 F.3d 116, 133 (lst Cir. 2008) (holding otherwise inadmissible evidence may be permitted when the court finds in fairness that the proffered evidence should be considered contemporaneously). A leading commentator on Iowa evidence law suggests, however, that under the express language of the rule, the evidence need not be admissible. Doré, § 5.106:1, at 94. If so, the rule of completeness may trump the ordinarily applicable rules of evidence. Yet, the rule cannot be simply used as an "end run around the usual rules of admissibility." *Castro-Cabrera*, 534 F. Supp. 2d at 1161.

Although the State has not argued there was an issue preservation problem in this aspect of Huser's argument, we confront a question of issue preservation here. Huser did not directly or explicitly attack the district court's "good for the goose, good for the gander" approach in his appellate brief. Yet, the obvious implication of Huser's appellate brief is that Woolheater's statements to Zwank should have come in without the Mitrisin, Connett, and Webb hearsay. It seems to us that the failure of advocacy rests primarily with the State. It was the State's burden, both in the district court and on appeal, to raise a coherent theory for the admissibility of Woolheater's comments to Mitrisin, Connett, and Webb.

We thus conclude that there is no bar to us considering Huser's basic claim, namely, that Woolheater's comments to Zwank should have been admitted without linkage to the admission of other unfavorable testimony.

For the reasons expressed above, we conclude that Woolheater's statement to Zwank after the crime—that Morningstar had something on Woolheater that could send him to prison—was admissible as a statement against interest. We further conclude there is no basis for requiring admission of other Woolheater statements based on opening the door, curative admissibility, or rule 5.106. In particular, we view rule 5.106 as not permitting admission of other hearsay conversations that have no bearing on the Zwank conversation itself.

As a result, Huser should have been allowed to present to the jury Zwank's testimony that Woolheater told her that Morningstar had something on Woolheater that could send him to jail. Further, given the closeness of this case, we do not find the error harmless. Zwank's testimony would have given Huser a powerful argument, namely, that Woolheater acted to save his own skin rather than at the direction or encouragement of Huser.

## V. Prosecutorial Misconduct.

Huser argues that a mistrial should have been granted because the prosecution's misconduct was severe and pervasive. Huser points to the prosecution's soliciting backdoor hearsay, its failure to timely comply with discovery requests, and the prosecution's references to the earlier trial in front of the jury. Huser concludes that these violations were intentional and cast doubt on the reliability of the verdict.

The State argues that it complied with discovery requests and disputes Huser's assertions of violations. Additionally, even assuming

the State committed intentional misconduct with respect to the Mitrisin hearsay, this misconduct was not severe or pervasive and was not significant to central issues in the trial because other evidence much more convincingly established the links between the key individuals. The State explains that the couple of references to the earlier trial were inadvertent. The State concludes, therefore, that the denial of Huser's motion for mistrial was reasonable.

Because we resolve this case on other grounds and expect that the issues will not reoccur on retrial, we do not consider the prosecutorial misconduct claims.

## VI. Due Process.

Huser makes a brief, conclusory argument that the complete record shows that the cumulative effect of all the previously discussed errors denied him a fair trial and due process. *See State v. Bass*, 349 N.W.2d 498, 504–05 (Iowa 1984) (considering a cumulative effect claim). We do not consider this claim because of our resolution of the case on other grounds.

## VII. Conclusion.

For the above reasons, we vacate the decision of the court of appeals and reverse the judgment of the district court. We remand for a new trial.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Mansfield, Waterman, and Zager, JJ., who concur in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

Although I join most of the court's opinion, I cannot agree with Part IV, and I would not order a third trial of this case. I do not think the district court's handling of the Michelle Zwank hearsay testimony was improper.

I am persuaded by the alternative reasoning of *either* the court of appeals *or* the district court concerning Zwank's testimony. According to Zwank, a couple of days before Lance Morningstar's disappearance, Louis Woolheater told her that Morningstar knew something that could get Woolheater in trouble and land him in jail. This is the Woolheater out-of-court statement that Huser mainly wanted to introduce at trial.

**I. The Excluded Out-of-Court Statements.**

To begin, it is important to review the entire list of Woolheater out-of-court statements that were not admitted at the second trial.

1. Before Morningstar disappeared, Woolheater told Lawrence Webb that he (Woolheater) had been following Morningstar, that he was going to rough him up, and that he had already done so by breaking his ribs. When Webb asked Woolheater why he would hurt Morningstar, Woolheater explained, "Vern [Huser] wanted something done about it."

2. On another occasion, shortly before Morningstar disappeared, Woolheater drove with Patti Mitrisin to Woolheater's Quonset hut, exited the vehicle, and met with a person at the hut. Upon Woolheater's return, he told Mitrisin he had been meeting with Huser, that "there was a guy messing around with Vern's wife or ex-wife . . . and he [Huser] wanted this guy roughed up." He further stated that he was going to "get [his] uncles or [his] nephew or somebody to do that."

3. Also before Morningstar disappeared, Woolheater told Marie Connett in a phone conversation that he had a friend whose wife was cheating on him. Woolheater told Connett he was going to kill the other man because "we stick together."

4. The day after hunters came upon Morningstar's remains, Woolheater told Webb that only Woolheater, Huser, and Webb knew about the body.

5. One evening when Woolheater and Zwank were going by Morningstar's house a couple of days before Morningstar disappeared, Woolheater told Zwank Morningstar knew something about him that could get him into trouble and he would end up back in jail. "It was kind of vague."

6. A "couple of days later," on the fateful night of September 30, 2004, Woolheater told Zwank that "Ricky and Mark [Woolheater's purported nephew and brother] were going to deal with Lance." Thereafter Woolheater pretended to be in communication with Ricky and Mark. Woolheater had Zwank drop him off near Morningstar's house so he could "check and see what was going on." Later, Zwank picked up Woolheater and said something like "Ricky made a hell of a shot," before Woolheater and Zwank loaded what was apparently Morningstar's body in the car.

At trial, Huser wanted to get items #5–#6 *only* admitted— principally item #5—while keeping items #1–#4 from being admitted. The district court ruled that items #5–#6 *could be* admitted, but this would "open the door" to the admission of items #1–#4.

As I read the record, Huser's counsel did not challenge this open-the-door ruling at trial. Nor, as I read the briefing, did he challenge it on

appeal. So I do not believe error was preserved on this evidentiary ruling.

Even if error was preserved, both the court of appeals and the district court gave independently valid reasons for sustaining the ruling.

## II. Statement Against Interest.

For its part, the court of appeals bypassed the issue of opening the door by simply ruling that items #5 and #6 did not qualify as statements against interest. I think the court of appeals got it right.

At the time of trial, Iowa Rule of Evidence 5.804(*b*)(3) (2013) defined a statement against interest as follows:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Item #5 does not qualify as such a statement in my view. Woolheater's "vague" assertion that Morningstar had something on Woolheater that could land Woolheater back in jail was not a statement that could expose Woolheater to criminal liability. Nor were there corroborating circumstances that clearly indicate its truthfulness.

Item #6 does not qualify, either. Let's assume the statements that Ricky and Mark were going to deal with Morningstar and that Ricky had made a hell of a shot could be viewed as exposing Woolheater to criminal liability for conspiratorial involvement in the shooting of Morningstar. Nonetheless, the statements are clearly not trustworthy. No one contends that "Ricky and Mark" were actually involved in shooting Morningstar. This was a fabrication.

Notably, the majority treats #5 and #6 as if they were just one statement. But they aren't. They were made a couple of days apart. In *State v. Paredes*, we indicated that the court should not treat an entire narrative as a single statement but should limit the relevant statement to "inculpatory statements and the collateral material necessary to provide context" to the relevant statement. 775 N.W.2d 554, 565 (Iowa 2009). Certainly, we did not say you could treat statements *with two days of distance between them* as one unit for rule 5.804(*b*)(3) purposes.

Even so, there are no corroborating circumstances of trustworthiness. In fact, if you treat #5 and #6 as a single statement, this simply highlights the unreliability of the whole thing. *See id.* at 567 ("[T]he best approach to determining whether a statement is adequately corroborated appears to be a multifactored test in which all evidence bearing on the trustworthiness of the underlying statement may be considered.").

The majority points to three out-of-state cases to support its reasoning, although it doesn't really tell us much about them. I would like to go through all three cases, because none of them help the court.

In *People v. Jackson*, 1 Cal. Rptr. 2d 778 (Ct. App. 1991), the defendant sought to introduce the following exchange that occurred thirty minutes after the shooting:

> Defendant said to Tolbert, "Greg, 'You shot that guy.'" To which Tolbert replied, "'No, I don't think I hit him.'" The defendant persevered, "'No, I think you shot the guy. He was a big brother.'" Tolbert responded, "'Well, I don't care. He was a bully.'" Defendant offered his own testimony and that of Lamont Butcher to this conversation.

*Id.* at 782. Jackson thus involved a single statement that (1) exposed the declarant to criminal liability, while also (2) giving a potential motive. The court held the statement should have been admitted. *Id.* at 782–83.

*People v. Pierre*, 11 N.Y.S.3d 389 (App. Div. 2015), concerned the following: "Two witnesses testified at the hearing that a third party (declarant) admitted that he beat the two victims with a baseball bat in their apartment and set a fire to destroy the evidence." *Id.* at 390. Like *Jackson, Pierre* addressed specific statements that exposed the declarant to criminal liability while also including information about motive. The court held the statements should have been admitted. *Id.* at 391.

Finally, in *State v. Morales*, 788 N.W.2d 737 (Minn. 2010), the tables were turned somewhat. The question was whether the following statements introduced at trial by the state should have been admitted:

> In the first two statements, Vega-Lara admitted that he and another person each carried a gun and went to the house of prostitution with the intent to commit a robbery. The fact that Vega-Lara claimed that another person went with him and also carried a gun does not lessen Vega-Lara's own culpability. . . .
>
> Vega-Lara's third statement, as relayed by M.G. was that "another person was struggling with the victim and Mr. Vega-Lara shot the victim."

*Id.* at 766. The court found all three statements admissible, noting that they exposed the declarant to criminal liability even though they also inculpated a third party. *Id.* Although the court today characterizes the first two statements as "statements of motivation for criminal acts," I would describe them simply as admissions to criminal acts.

In short, none of these three cases involve a stand-alone statement of motive like item #5. None of them hold that such a statement can be admitted as a statement against interest. If anything, the first two cases would support the admission of items #1, #2, and #3—but not item #5. Items #1, #2, and #3, not item #5, are the out-of-court declarations that *both* exposed the declarant to criminal liability *and* included information on motive.

Therefore, I agree with the court of appeals. One could simply affirm on the ground that items #5 and #6 were properly excluded and leave the matter there.

However, to its credit, the trial court offered Huser a fair alternative to outright exclusion. The court said items #5–#6 could be admitted but then items #1–#4 could also be admitted. Huser declined the deal. Yet this ruling was sound and also should be affirmed.

**III.  Opening the Door.**

In discussing "opening the door," the majority posits this case as one where Huser sought to introduce otherwise admissible evidence and the district court decided this would open the door to otherwise inadmissible evidence. As I've already explained, I think the opposite is true. Items #1, #2, #3, and #4 could have been admitted as statements against interest, but items #5 and #6 could not.

Regardless, it would be illogical to allow the defendant to introduce the one Woolheater statement that might have suggested Woolheater acted out of a personal motive while prohibiting the State from introducing the four Woolheater statements that suggested Woolheater was acting at the behest of the defendant.

Although this precise issue has not been heavily litigated, some caselaw supports my view. In *State v. Ellison*, 140 P.3d 899 (Ariz. 2006) (en banc), the court held,

> [I]f Ellison had introduced Finch's statements to Howe while at Red's Bar, he could not then claim a Confrontation Clause violation if the prosecution introduced Finch's other statements made during their continued conversation on the way home from the bar. Judge Moon thus did not err in ruling that if Ellison offered part of Finch's hearsay statements, the State could question Howe with the remainder of the conversation.

*Id.* at 913–14. Similarly, in *State v. Buckhanon*, No. M2011-00619-CCA-R3-CD, 2012 WL 5989858 (Tenn. Crim. App. 2012), the court reasoned that "allowing Mr. Smith to testify concerning what Warfield [the unavailable declarant] had told him would open the door to allowing the differing versions of the incident given by Warfield." *Id.* at *5. The court added further, "[T]he contradictory statements given by Warfield were evidence of a lack of the indicia of reliability required by [Tennessee caselaw]." *Id.*; *see also* Cal. Evid. Code § 1202 (West, Westlaw current with urgency legislation through Ch. 4 of 2017 Reg. Sess.) ("Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct."); *id.* cmts. ("Section 1202 substitutes for this case law a uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases, whether or not the declarant has been given an opportunity to explain or deny the inconsistency. If the hearsay declarant is unavailable as a witness, the party against whom the evidence is admitted should not be deprived of both his right to cross-examine and his right to impeach.").

It is important to be clear about what is at issue here. The issue is not whether noninculpatory statements of an unavailable declarant should come into evidence whenever inculpatory statements of the same declarant are admitted. I do not argue for such a sweeping principle. Rather, my point is that when an unavailable declarant has given different and inconsistent versions of a story, it would be unfair for the defendant to be able to cherry-pick only one version for the jury's benefit.

Indeed, Huser's trial counsel accepted the essential justness of the district court's open-the-door ruling and, in my view, did not preserve error on it.[3]

For all these reasons, I would affirm Huser's conviction and sentence.

Waterman and Zager, JJ., join this concurrence in part and dissent in part.

---

[3]At the conclusion of the offer of proof, the district court stated,

[T]he trouble I'm having, Mr. Parrish, is then if the defense is allowed to bring in the [statement] of Woolheater saying that he had a motivation, then why would not the [statements] that Woolheater said regarding -- associating Vern [Huser] to it, not to be personal --

MR. PARRISH: I understand.

THE COURT: -- but Mr. Huser to it, why would that [not] be admissible also?

MR. PARRISH: Well, exactly, Judge, and that's one of the discussions we had -- and we've talked about it the last two or three evenings -- is that what it does open the door, that's why I wanted to bring it to the Court's attention.