# IN THE COURT OF APPEALS OF IOWA

No. 16-1148
Filed October 11, 2017

**V.P., a minor, by DHIREN PATEL and
SHITAL PATEL, his parents and next friends,**
    Plaintiff-Appellant,

**vs.**

**DR. GREGG CALDERWOOD and
GREAT RIVER WOMEN'S HEALTH CORPORATION,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Des Moines County, Michael J. Schilling, Judge.

A minor by his parents and next friends appeals the district court's rulings regarding rebuttal evidence and refusal to grant a new trial. **AFFIRMED.**

Steven J. Crowley and Edward Prill of Crowley, Bünger & Prill, Burlington, for appellant.

Christine L. Conover and Carrie L. Thompson of Simmons Perrine Moyer Bergman, P.L.C., Cedar Rapids, for appellees.

Heard by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**BOWER, Judge.**

A minor (V.P.) by his parents and next friends appeals the district court's rulings regarding rebuttal evidence and refusal to grant a new trial. We find the district court did not abuse its discretion by refusing to allow rebuttal evidence. We also find the plaintiff did not preserve error on his motion for new trial. We affirm the district court.

## I. Background Facts and Proceedings

V.P was born on March 2010 after a four and a half hour second stage labor. V.P. was barely alive and required intensive resuscitation efforts. He was quickly transferred to the University of Iowa Hospitals and Clinics. V.P. was oxygen deprived and had some level of acidosis.[1] V.P. now suffers from severe and permanent brain damage and cerebral palsy.

The plaintiff filed suit against Dr. Gregg W. Calderwood, Great River Women's Health (Great River), and Great River Medical Center, though Great River Medical Center was subsequently dismissed form the case. The plaintiff claims Dr. Calderwood and Great River failed to properly diagnose oxygen deprivation during labor, and, as a result, failed to perform a cesarean section before V.P.'s injuries became severe and permanent.

Trial began on March 1, 2016, and lasted thirteen days. During the trial, both sides presented a number of witnesses, including medical experts. Much of the testimony focused on a fetal heart rate tracing generated by a Phillips Model

---

[1] Fetal acidosis is a condition in which an increased level of acid is present in an unborn child's blood.

500X Fetal Heart Monitor. The plaintiff attempted to introduce an expert to provide rebuttal testimony, but the district court found the testimony was

> not proper rebuttal . . . because a significant part of the evidence is cumulative . . . some of the proffered testimony is an effort to introduce Exhibit 145 . . . when the plaintiff was unable to do so during the case in chief . . . [and] the testimony of [the expert] injects one or more new issues or sub-issues into this trial.

The jury found Dr. Calderwood was not negligent. The plaintiff moved for a new trial based on Dr. Calderwood's statements during his testimony that the trial was "pretty much torture" and if he felt he was at fault he would have told his malpractice insurer "just pay and let me get on with my life." The motion was denied.

The plaintiff now appeals claiming the district court erred by excluding rebuttal evidence and by failing to grant a new trial.

## II. Standard of Review

Trial courts are given broad discretion to admit rebuttal evidence, and the court's decision will only be disturbed if a clear abuse of discretion is shown. *Carolan v. Hill*, 553 N.W.2d 882, 889 (Iowa 1996). "An abuse of discretion is shown only where such discretion was exercised by the court on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* A trial court's hearsay ruling is reviewed for correction of errors at law. *State v. Huser*, 894 N.W.2d 472, 495 (Iowa 2017).

## III. Rebuttal Evidence

The plaintiff claims the district court erred by excluding the evidence offered as rebuttal. The district court found the offered evidence was in part cumulative, an attempt to introduce evidence the plaintiff had been unable to

enter during the case in chief, and to add new issues to the trial. "Rebuttal evidence is that which explains, repels, controverts, or disproves evidence produced by the opposing party." *Carolan*, 553 N.W.2d at 889. "Evidence that has no direct tendency to do this is inadmissible on rebuttal." *Id.*

The plaintiff attempted to introduce the expert testimony of Dr. Barry Schifrin, concerning: (1) the tracings clearly showed a confusion of maternal and fetal heart rate by mid-morning; (2) the fetal heart monitor frequently confused the heart rate of the fetus and the mother; (3) the strip could not have been tracing V.P.'s heart rate near the time of birth, as V.P. was born severely stressed and compromised and the tracing did not indicate this; (4) the tracings of the heart rate the machine produces cannot be relied on to differentiate the maternal and fetal heart rate without some other indicia; (5) Dr. Schifrin consulting on the technical aspects of the machine and the development of the technology to monitor fetal heart rate; (6) echocardiograms are more accurate to monitor the mother's heart rate than pulse oximeters; and (7) exhibit 145 was the proper manual for the fetal heart monitor used by Dr. Calderwood and the manual contained information regarding the proper standard of care, including using a separate heart monitor to warn of confusion between the fetal and maternal heart rate.

### a. Cumulative Evidence

The district court made general statements holding the majority of Dr. Schifrin's testimony was cumulative. "Evidence which is merely cumulative, adding nothing further to the position taken by previous witnesses, which merely

bolsters or supplements that already adduced by the plaintiff, is not admissible as rebuttal." *Id.* (quoting 75 Am.Jur.2d *Trial* § 374, at 573 (1991)).

The bulk of Dr. Schifrin's testimony was a detailed analysis of the heart rate tracings generated by the monitor. In response to defendant's objections, plaintiff's counsel stated he understood the rebuttal testimony was "substantial" in length and conceded, "We don't have to go through the [tracings] again . . ." Multiple experts from both sides presented detailed testimony regarding what was taking place and at what time based on the tracings. The plaintiff claims Dr. Schifrin's testimony was not cumulative, as it addressed confusion between the maternal and fetal heart rate and opined the heart rate near the time of birth could not have been correct considering V.P.'s condition at birth.

During her testimony, plaintiff's expert, Dr. Thatcher, testified, "Coincidence is a term that we see . . . when mother's heart rate is similar to the heart rate [of the baby] . . . . [The monitor] alerts us to say, hey, we may not be picking up baby, this might be mom instead." Dr. Thatcher again testified, "Coincidence is an alert that the machine—the fetal heart rate monitor will alert the staff that there is a similarity between the mother's heart rate and what the machine is picking up as the baby's heart rate." Dr. Thatcher also noted specific times in the tracings when the heart rates were in close proximity. Dr. Thatcher noted the specific times the monitor alerted the defendants a coincidence occurred:

> Q: All right. Let's move on to—at about 2:47 here, sorry, it says coincidence—a coincidence detected by fetal monitor and then alarm acknowledged. Is that self-explanatory? A: Yes.
> Q: The alarm went off and Nurse Bonar acknowledged it. . . . A: Yes.

. . . .

Q: At 7 a.m., just before the beginning of second stage labor, it looks like the fetal heart rate for baby is recorded at 130 [beats per minute], correct?  A: Yes.

Q: Now—so we know that is coming through one of those machines-through the transducer, correct?  A: Yes.

Q: And at 7:03 the maternal heart rate is reported to be 125, correct?  A: Yes.

Q: And I note that it follows a maternal blood pressure reading, so now [the baby] is listed at 122—I think it was 122?  A: I think it was 130.

Q: I'm sorry, 130, that's right.

The plaintiff also claims Dr. Schifrin's testimony asserted simply observing the tracings was not an acceptable practice and a separate monitor should have been used, such as a pulse oximeter or fetal scalp electrode.  Again, the plaintiff presented similar expert testimony during the case in chief.  Dr. Thatcher testified:

A: This is pulse oximeter.  So pulse meaning heart rate, right?  This goes on mom's finger, okay?  And this plugs in, so we can tell what mom's heart rate is.  It will also tell us her oxygen saturation in her blood level.

Q: Okay.  A: But the primary use for this on the machine is to look for the mother's heart rate.

Q: Okay.  Why is it important to separate mom's heart rate from baby's?  A: It is important to remember that the [fetal heart monitor] detects blood flow.  It can detect baby's heart—it can detect baby's blood flow, it can detect mom's blood flow, okay?

Q: All right.  I'm going to—I'm showing you what is Exhibit 102.  It is a demonstrative exhibit and it's in a package.  Can you identify what that is?  A: This is a . . . fetal scalp electrode.  This is an internal monitor. . . . When we do an exam, we will put this on the baby's head and this will measure the baby's heart tones directly.

Q: Okay.  So this is like—this measures it right on the baby themselves or herself?  A: Yes it . . . actually gets an [echocardiogram].  It gets a heart pattern and it transmits it and shows up as an internal, so it is more specific.

. . . .

Q: I'm holding the pulse oximeter, and as you said earlier this gets hooked to mom's finger, and let's first talk about are there

any disadvantages to this, from a medical standpoint?  A: No, not that I am aware of. . . .

Q: Right.    Again, is this non-invasive?    A: Oh, it's non-invasive.  That's one of the advantages, yes.

Q: And if this is plugged into the machine, the machine knows I'm getting mom's heartbeat through this sensor?  A: That is correct.

Q: And then it can compare what it's getting through the [fetal heart monitor] and the pulse oximeter and say how do these look, the same or different; is that fair?  A: That is—that is correct.

Another expert, Dr. Murray, also testified:

Q: [T]his has been discussed already with the jury, but can you define the term coincidence?    A: This computer was programmed so that if there were two devices getting the same signal source—because they're two devices, it won't be the exact same image, but they'll overlap, and the machine's computer software knows to alert the person looking at it that you have one patient with two devices.  Now, that could be the mother with a thing on her finger called a pulse oximeter and the ultrasound slipped and its monitoring her aortic pulsations . . . and then it will say coincidence.  And the machine is programmed to analyze that and to alert the care providers, and when it prints electronically, we get to see the alarms, but on the unit you'll hear a sound and a flashing of the machine.

Q: Now would be a good time to talk about the machine itself.  Are there situations, based upon your experience as a—labor and delivery nurse and someone who teaches nurses, does the fetal heart rate monitor always monitor just the baby?  A: No, and that's one of the limitations we call it, or problems.  That's why you really have to know who's who. . . .  Because if you monitor the mother instead of the baby, you don't know what the baby's trying to tell you.

. . . .

Q: What is the way that a nurse can determine maternal heart rate, if there's no pulse oximeter on?  A: There are multiple ways.  One is to palpate a pulse, but we can't compare that image to the fetal image.

Another way is to plug in the twin ultrasound, because there are two devices, and use her like a twin and put it on her heart.  Then you can continuously monitor her and the baby at the same time, see if they're the same or different.  Those are two ways.

. . . .

Q: [We're] now at about 8:20 in the morning or so.  What did you see?  A: So [the fetal heart monitor] continued to print out

mom's rate, and we don't know what's happening with the baby at this time.

Both experts testified it would have been safer for the baby and given a clearer heart rate to use a pulse oximeter or fetal scalp electrode. We find the district court did not abuse its discretion by finding parts of Dr. Schifrin's testimony were cumulative.

### b. New Issues

The defendants claim Dr. Schifrin's testimony regarding his technical knowledge of the machine and the discussion of using an echocardiogram instead of a pulse oximeter constituted new issues and therefore was not proper rebuttal evidence. Rebuttal evidence is generally limited to issues introduced by the opposing party, and should not introduce new issues. *See* 75 Am.Jur.2d *Trial* § 372, at 571–72 (1991). The plaintiff claims the defendants had presented expert testimony regarding the technical abilities of the machine, specifically that there was no need to use a second heart rate monitor. The plaintiff additionally noted the machine itself had been identified as an exhibit and entered into evidence.

The machine itself was introduced into evidence, but no experts had discussed the development of the machine. Additionally, both the plaintiff's and the defendants' experts had discussed monitoring the mother's heart rate with a pulse oximeter but no expert advocated the use of an echocardiogram or stated it was more effective than the pulse oximeter. We agree with the district court, Dr. Schifrin's testimony regarding his work developing the heart monitoring

technology and the use of an echocardiogram constituted new issues and were not proper rebuttal evidence.

### c. Exhibit 145

The plaintiff attempted to enter exhibit 145, a manual for a fetal heart monitor, both in his case in chief as well as during an offer of proof. Exhibit 145 was ruled to be hearsay during the case in chief. After the offer of proof, the district court stated its opinion "some of the proffered testimony is an effort to introduce Exhibit 145 or evidence from the pages of 145 in rebuttal, when the Plaintiff was unable to do so during the case in chief." Exhibit 145 was inadmissible as hearsay, and therefore, the district court properly excluded it as rebuttal evidence.

## IV. New Trial

The plaintiff finally claims the district court erred by refusing to grant a new trial after Dr. Calderwood made a statement regarding insurance and describing the trial as "torture." The defendants claim the plaintiff did not preserve error on the issue of a new trial as he did not object to the statement during trial and only after a defense verdict was returned did they do so.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Bank of Am., N.A. v. Schulte*, 843 N.W.2d 876, 883 (Iowa 2014) (citation omitted). Issues must also be raised "with sufficient specificity to alert the court to the claimed error." *See* Thomas A. Mayes & Anuradha Vaitheswaran, Error Preservation in Civil Appeals in Iowa: Perspectives on Present Practice, 55 Drake L. Rev. 39, 52 (2006).

During redirect examination Dr. Calderwood stated "This trial is pretty much torture. If—it would have been so much easier just to tell my insurance company, just pay and let me get on with my life than sit here and do this." The plaintiff claims these statements were an attempt to evoke sympathy from the jury and were unfairly prejudicial as they enhanced Dr. Calderwood's credibility and sought to convince the jury he was willing to settle if he believed himself at fault. The plaintiff did not object. The plaintiff claims he was not required to object as a prior motion in limine controlled.

> [W]here a motion in limine is resolved in such a way it is beyond question whether or not the challenged evidence will be admitted during trial, there is no reason to voice objection at such time during trial. In such a situation, the decision on the motion has the effect of a ruling.

*State v. Miller*, 229 N.W.2d 762, 768 (Iowa 1975).

However, the district court specifically stated, "I want to make it clear that every limine ruling is only preliminary and I simply don't have a good enough record to be able to make a good call on any of those issues that were raised." The district court made its holding clear later in the trial saying, "Counsel, while we're outside the presence of the prospective jurors, I just want to make something clear, again with respect to the orders that I've issued in limine, that those are only preliminary orders made in the context of a limited record." Therefore, the plaintiff was required to object to the statements regarding insurance he believed to be covered by a motion in limine in order to preserve error.

Plaintiff's counsel asked for, and received, an order in limine after Dr. Calderwood's statements forbidding the defendants from mentioning, "Dr.

Calderwood testified that if he thought he was culpable or responsible for the injuries of [V.P.] he would have settled the case or referred the case to his insurance company urging settlement." However, while arguing for the motion in limine plaintiff's counsel stated, "I think it's fair game to talk about the fact that he became emotional and that he complained that going through the trial was like torture." The district court's order granting the motion in limine only addressed the issue of settlement and did not prevent either party from discussing Dr. Calderwood's emotional response. The plaintiff specifically asked the district court to be allowed to discuss that portion of testimony and should not now be allowed to argue it was prejudicial. We find error was not preserved on the issue of the motion for new trial.

**AFFIRMED.**