# IN THE COURT OF APPEALS OF IOWA

No. 23-1920
Filed July 23, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**SALIFOU SOLOMON SAHR,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Lawrence P. McClellan,

Judge.


        Following a jury trial, a defendant challenges his convictions.  **AFFIRMED.**


        Christopher Kragnes, Sr., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Katherine Wenman, Assistant Attorney

General, for appellee.


        Considered without oral argument by Schumacher, P.J., and Buller and

Sandy, JJ.

**SCHUMACHER, Presiding Judge.**

Following a jury trial, Salifou Sahr appeals his convictions for first-degree murder, two counts of assault with intent to inflict serious bodily injury, and two counts of first-degree robbery. Sahr raises three challenges on appeal. Sahr alleges the district court erred by admitting out-of-court statements into evidence under the rule classifying certain co-conspirator statements as nonhearsay. Specifically, Sahr contends there was not sufficient evidence of a conspiracy for the co-conspirator rule to apply. Sahr also contends the district court erred by permitting two witnesses to testify despite their conflicting prior testimony. And, Sahr alleges the State failed to present sufficient evidence to support any of his convictions. Upon review, we affirm.

## I.      Background Facts and Proceedings

The following facts are supported by evidence presented at trial. Under the guise of a drug deal, Andrew Meyer and Samuel Sando arranged to meet on the night of January 9, 2022. Sando and Sahr were close friends and were together at an apartment complex on Pennsylvania Avenue in Des Moines earlier that day. Although neither Sando nor Sahr lived at the apartments on Pennsylvania Avenue, Sando asked Meyer to meet him there.

Meyer, who was without his own vehicle, was given a ride to the meeting by his friend Trishay Thompson. Thompson's girlfriend Alena Williams rode along. Thompson drove, Meyer rode in the car's front passenger seat, and Williams sat in the back. None of the car's three occupants had a gun. When the trio arrived,

Meyer informed Sando via text message using Facebook Messenger[1]—the same means of communication Meyer and Sando used to arrange the meeting.

Sando resisted walking out to meet Meyer at the car. Sando asked Meyer to "come inside." But Meyer declined. Around fifteen minutes passed from the trio's arrival. Meyer began to have doubts. He repeatedly asked Sando how long it would be. After Meyer messaged that he was about to leave, Sando said he was heading out. Neither Meyer nor Williams saw anyone approach the car. The night was dark, and the parking lot was dimly lit.

What occurred next happened either simultaneously or in rapid succession. A bright blue light came through the windshield. A laser-like beam pierced into the car. Gunshots rang out. Thompson tried to drive off, but the car "puttered," and stalled. Meyer ducked his head toward the floorboards until the gunshots stopped. By that point, the car had traveled from the parking stall toward Pennsylvania Avenue. Meyer and Williams still observed nothing in the darkness outside of the car. In the car, Meyer saw Thompson was shot.

It would later be determined that Thompson was struck by a bullet behind his ear, which passed through the vertebrae high in his neck and cut his spinal cord. The projectile lodged into Thompson's spinal canal. On January 27, Thompson died from complications caused by the gunshot wound.

The Des Moines Police Department arrived on scene within minutes of the shooting. On both sides of the area in which the car was parked when the shooting began, officers discovered two sets of ammunition casings: three .40-caliber

---

[1] Facebook Messenger is an online social media app that connects through cellphone networks and the internet.

casings on one side and three 9mm casings on the other. An apartment resident told officers she saw two people fleeing to the north after she heard the gunshots. Two sets of footprints heading north away from the crime scene were discovered in the snow-covered ground.

Officers eventually identified Sahr and Sando as potential suspects. Officers traced Sahr and Sando to a Waterloo residence belonging to M.D., the sister of Sahr's girlfriend. Just over a week after the shooting, officers conducted a search warrant on M.D.'s residence and apprehended Sahr and Sando.

Following a jury trial, Sahr was convicted of one count of first-degree murder with a dangerous weapon enhancement, two counts of first-degree robbery with dangerous weapon enhancements, and two counts of assault with intent to inflict serious injury. Sahr appeals.

## II. Analysis

## A. Admissibility of Coconspirator Statements

Sahr challenges the district court's admission of records from Sando's Facebook Messenger account and audio and video exhibits of Sando's interviews with law enforcement officers, admitted into evidence as Exhibits 23, 25, and 26.[2]

A statement offered at trial against a defendant and made by a defendant's "coconspirator during and in furtherance of the conspiracy" is not hearsay. Iowa R. Evid. 5.801(d)(2)(E). Before admitting a coconspirator's statement under Iowa Rule of Evidence 5.801(d)(2)(E), a district court must find by a preponderance of

---

[2] The State concedes, and we agree, Sahr preserved error on his challenge to Exhibits 23, 25, and 26 by filing a motion in limine challenging the exhibits' admissibility, obtaining a ruling on the motion, and objecting when the State offered them at trial. *See State v. Delaney*, 526 N.W.2d 170, 177 (Iowa Ct. App. 1994).

the evidence that a conspiracy existed between the declarant and defendant. *State v. Huser*, 894 N.W.2d 472, 504 (Iowa 2017). "A conspiracy is 'a combination or agreement between two or more persons to do or accomplish a criminal or unlawful act, or to do a lawful act in an unlawful manner.'" *Id.* (quoting *State v. Tonelli*, 749 N.W.2d 689, 692 (Iowa 2008)).

As Sahr does here, a defendant may challenge the admission of a coconspirator's statements by arguing insufficient evidence supported the district court's determination that a conspiracy existed. *See, e.g.*, *State v. Florie*, 411 N.W.2d 689, 691, 695 (Iowa 1987). In reviewing such a challenge, we will uphold the district court's finding if the determination is supported by substantial evidence. *Id.* at 695; *see also Huser*, 894 N.W.2d at 504.

A district court is not bound by the rules of evidence when determining preliminary questions of fact, such as the existence of a conspiracy. *State v. Tangie*, 616 N.W.2d 564, 570 (Iowa 2000). While the "[e]vidence relied on in determining the existence of a conspiracy must include some proof independent of the co-conspirator's statement," the district court is permitted to consider the disputed statement in making such a determination. *Florie*, 411 N.W.2d at 696; *see, e.g.*, *Tangie*, 616 N.W.2d at 571.

To establish the admissibility of Sando's statements as a coconspirator, the State submitted an offer of proof. Following the offer of proof, the district court made a preliminary finding that "the State has established by a preponderance of the evidence that a conspiracy existed." Upon our review of the record, we find substantial evidence supports the district court's determination.

Evidence independent of the challenged statements supports the district court's finding. Physical evidence at the crime scene established that two individuals had shot into the car. An apartment-complex resident testified Sahr and Sando were at her apartment on the day of the shooting, a fact confirmed by Sando in a later police interview. Sahr's girlfriend B.H. testified that Sahr admitted he and Sando were involved in the shooting. Sahr told her the shooting occurred because he and Sando were "trying to catch some ops of [Sando's]." And B.H.'s sister M.D. testified that Sahr admitted "they had a body," meaning "somebody's dead," and indicated through his other statements that Sahr and Sando acted together.[3]

The disputed statements also support the district court's determination. Facebook Messenger records show Sando's account was used to lure Meyer to the Pennsylvania Avenue apartments and attempt to ease Meyer into meeting Sando inside privately for the deal. In the offer of proof, Officer Benjamin Carter, who interviewed Sando following the shooting, testified regarding Sando's statements during his interviews. At first Sando denied any involvement or that he was in Des Moines on January 9. But eventually Sando admitted he and Sahr were at the Des Moines apartments that day. Sando said he and Sahr were discussing how "they're down on their luck, they need money," and they were "looking for a stain, which he basically says . . . is a robbery." Sando confirmed that the duo fled to the north together following the shooting, as shown in surveillance footage capturing two human figures fleeing the area within a minute

---

[3] According to M.D.'s testimony, Sahr said Sando wasn't responsible for the death—that Sando didn't "do it"—"because [Sando] was scared."

of the shooting. And, Officer Carter testified about a phone call Sando placed while alone in the police interview room. During the call, Sando instructed the listener to contact B.H. so they could "get[] the stories straight about what happened."

In combination with the challenged statements and the testimony provided in the offer of proof, this extrinsic evidence provides substantial record evidence to support the district court's finding of a conspiracy. For example, Sahr's admission to B.H. about the shooting happening while he and Sando were trying to "catch some ops" harmonizes with Sando's statements about looking for a "stain" and make it clear that, at a minimum, the duo plotted to rob Meyer. And when considered alongside Sando's statements during the interview-room phone call, Sando's statements of denial to Officer Carter could create a reasonable inference that the duo more likely than not colluded to cover up their involvement. Accordingly, the district court did not err in admitting Sando's statements under rule 5.801(d)(2)(E).

## B.  Sufficiency of Witness Credibility for Admissibility of Testimony

Sahr contends the district court erred in admitting B.H.'s and M.D.'s testimony because both "changed their stories multiple times under oath."

We generally review evidentiary rulings for an abuse of discretion. *State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022). An abuse of discretion occurs when the basis for the district court's ruling is clearly untenable, unreasonable, or an erroneous application of the law. *Id.*

Sahr relies on our decision in *State v. Smith* to argue, in essence, that "this is the rare case in which the testimony of the [witnesses] is so absurd that it must

be rejected as a matter of law."[4] *State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022); *see Smith*, 508 N.W.2d 101, 103–05 (Iowa Ct. App. Sept. 2, 1993). But our supreme court has since observed that the rule applied in *Smith* has only been applied "when reviewing whether evidence was sufficient to sustain a verdict." *State v. Cahill*, 972 N.W.2d 19, 33 (Iowa 2022) (citing *Smith*, 508 N.W.2d at 103–05). And, "[Sahr] does not cite a single reported Iowa case holding that inconsistencies in recollection or narrative are, by themselves, a ground for excluding a witness." *Id.* We conclude *Smith* offers no relief here.

"It was not the district court's job to decide on witness credibility prior to trial." *Id.* The conflict between the witnesses' trial testimony and their sworn testimony in prior proceedings was a matter for the jury to consider when assessing the witnesses' credibility. *See id.* Witness credibility goes to the weight of the evidence, not its admissibility. *Id.* We therefore find no abuse of discretion in allowing the challenged witnesses' testimony. *See id.*

## C.      Sufficiency of the Evidence

As the State observed, Sahr's sufficiency-of-the-evidence challenge is somewhat ambiguous. He does not specifically identify what element or elements of which convictions he disputes. He does however provide a bullet-point list of what he thinks the State's evidence lacked. And while none of Sahr's appellate briefing links this list to any element or jury instruction specific to any of his five convictions, the State addressed Sahr's statements as challenges to the elements of "(1) identity, which would be an element of each charged crime, and (2) element

---

[4] The State disputes Sahr preserved error on this argument. We assume without deciding error was preserved.

four of first degree murder, that he acted 'willfully, deliberately, and with specific intent to kill Trishay Thompson.'" We agree with the State's interpretation and address Sahr's challenges accordingly. *See Goode v. State*, 920 N.W.2d 520, 524 (Iowa 2018) (discussing the requirement that appellants raise specific claims on appeal).

The sufficiency of the evidence is reviewed for legal error. *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). A jury's verdict is binding on appeal if supported by substantial evidence. *Id.* "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* In reviewing sufficiency challenges, "we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (quoting *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017)).

**1.    Identity**

For the jury to convict Sahr of each of the five charges, the State was required to prove the criminal acts were performed by Sahr "or someone he aided and abetted." *State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018) ("Where, as here, the jury was instructed without objection, the jury instruction becomes law of the case for the purposes of reviewing the sufficiency of the evidence.").

In addition to hearing Sahr's admissions to B.H. and M.D., the jury saw a video dated approximately one month before the shooting in which Sahr wields a 9mm handgun with a "laser-flashlight combination . . . attached to it." Sahr is identifiable in the video by his voice and distinctive tattoo covering his right hand, which wielded the gun. As the video showed, the gun attachment projected

multiple lights in succession: a bright blue light, a broad red light, and a green laser dot. These lights coincided with testimony from Meyer and Williams. Meyer described a bright blue light and a laser-like beam appearing inside the car immediately before the shooting began. Williams recalled blue and red lights coming in through the car's windshield just before the shooting. At first, she thought the lights were the police, indicating the red and blue lights were not shining simultaneously but rather in succession. The caliber of Sahr's gun in the video also matched the 9mm casings found at the crime scene. The location of these 9mm casings indicated the shooter stood in front of the car, consistent with testimony stating the lights came through the car's front windshield.

Additional evidence placed Sahr at or near the crime scene around the time of the shooting. This evidence included witness testimony that Sahr was at the Pennsylvania Avenue apartments on January 9 and Sando's admissions that they were there together. Cellphone location data from a cellphone shared by Sahr and B.M. placed the phone in Des Moines near the crime scene at and around the time of the shooting. Cell site data also shows the phone moved north after the shooting occurred, mirroring the direction of the fleeing individuals immediately after the shooting. And although there is some dispute over whether Sahr had the cellphone at that time, evidence supports a reasonable inference that he did.[5]

---

[5] B.M. testified she believed Sahr did not have the phone on January 9 and that she had it. But messages between B.M. and Sando indicate B.M. was not in Des Moines at that time. She was in Waterloo at M.D.'s residence, caring for M.D.'s child. And Facebook records reveal that Sahr logged into Facebook Messenger—which requires a cell-data or Wi-Fi connected device—and used the app to communicate with Sando throughout the day on January 9.

Viewed in the light most favorable to the State, there is sufficient evidence for a jury to find beyond a reasonable doubt that Sahr or someone he aided and abetted performed the criminal acts for which Sahr was charged. Accordingly, we deny Sahr's challenge to the sufficiency of the evidence to prove his identity.

Because Sahr raises no other sufficiency challenges to his convictions for first-degree robbery or assault with intent to inflict serious injury, we affirm these convictions.

## 2. First-Degree Murder

On the charge of first-degree murder, the State was required to prove either (1) "Sahr, . . . or someone he aided and abetted, acted with willfully, deliberately, premeditatedly and with the specific intent to kill, and/or" (2) "Sahr, . . . or someone he aided and abetted, was participating in the forcible felony of Robbery when the shooting occurred."[6] As this instruction makes clear, the element Sahr challenges on appeal could be satisfied by evidence sufficient to support a willful and deliberate theory, a felony murder theory, or an aiding and abetting theory.

Here, the jury returned a general verdict. "If the jury returns a general verdict, an appellate court shall not set aside or reverse such a verdict on the basis of a defective or insufficient theory if one or more of the theories presented and described in the . . . jury instruction is sufficient to sustain the verdict." Iowa Code § 814.28 (2022). "In other words, we are required to affirm if at least one of the

---

[6] Sahr does not challenge the use of this jury instruction. *See Banes*, 910 N.W.2d at 639. Sahr also does not dispute sufficient evidence was presented on premeditation.

alternatives presented to the jury is supported by substantial evidence." *State v. Triplett*, No. 19-1902, 2021 WL 3074475, at *1 (Iowa Ct. App. July 21, 2021).

As we have upheld Sahr's two first-degree robbery convictions, the alternative felony murder theory was satisfied. *See* Iowa Code § 702.11 (including felonious robbery in the definition of "forcible felony"); *see also id.* § 711.2 (classifying first-degree robbery as a class "B" felony). Moreover, because Sahr did not challenge the aiding and abetting theory on which the jury was instructed, we could affirm his conviction under that alternative theory alone. *See, e.g.*, *Triplett*, 2021 WL 3074475, at *1 ("Even if Triplett is meritorious by convincing us there is insufficient evidence to prove [the alternative theory challenged on appeal], we would still be required to affirm his conviction under the other, unchallenged theory on which the jury was instructed." (citing Iowa Code § 814.28)).

Accordingly, we affirm Sahr's first-degree murder conviction without further consideration.

## III. Conclusion

Because the district court did not abuse its discretion in admitting the disputed evidence and the State presented sufficient evidence to support Sahr's convictions, we affirm.

**AFFIRMED.**